Mary D. RANKIN, Plaintiff,

v.

GREATER MEDIA, INC.,
et al., Defendants.

No. Civ.A. DKC 95–3302.

United States District Court,
D. Maryland.

April 28, 1997.

Diane Bodner, Swick & Shapiro, P.C., Washington, DC, for Plaintiff.

Lorence L. Kessler, Carl J. Hartmann, III, Mauro Morales, New York, NY, of counsel to the firm of McGuiness & Williams, Washington, DC, for Defendants.

## MEMORANDUM OPINION

CHASANOW, District Judge.

Plaintiff Mary D. Rankin filed a complaint against her former employer, alleging various claims of employment discrimination in violation of 42 U.S.C. § 2000e *et seq.* ("Title VII"), 42 U.S.C. § 12101 *et seq.* (The Americans with Disabilities Act or "ADA"), and 29 U.S.C. § 621 *et seq.* (The Age Discrimination in Employment Act or "ADEA"). Plaintiff's complaint is not separated into counts, and it is difficult to discern exactly what causes of action she is asserting. It appears, however, that Plaintiff claims (1) that she was discriminatorily demoted on the basis of her gender, age, and/or disability; (2) that she was subjected to a "pay inequity" on the basis of her gender, age, and/or disability; (3) that her employer failed to accommodate her disability; and (4) that she was constructively discharged from her employment. Plaintiff seeks reinstatement, back pay, and compensatory and punitive damages. Presently pending and ready for resolution is Defendants' motion for summary judgment on all of Plaintiff's claims. No hearing is deemed necessary, and the court now rules pursuant to Local Rule 105.6.

## I.  BACKGROUND

Defendant Greater Media, Inc., in conjunction with its subsidiary Greater Washington Radio, Inc., owned and operated two radio stations, WGAY–FM and WWRC–AM, which serve the Washington, D.C. area from offices located in the World Building in Silver Spring, Maryland. Plaintiff Mary Rankin came to work at WGAY–FM as a sales manager in 1992. She was recruited for the job by Alan Goodman, the new General Manager of WGAY–FM and WWRC–AM, who was reorganizing the management team at the stations. Plaintiff previously had worked with Mr. Goodman at another station in the Washington, D.C. market. Plaintiff was brought in to replace Richard Eury, a white male over the age of forty, who had been the WGAY–FM sales manager under Mr. Goodman's predecessor. Upon Plaintiff's arrival, Mr. Eury vacated the sales manager's offi-

cer, but remained an employee working as an account executive on the sales staff, selling advertising time on the radio. Plaintiff was responsible for deciding which accounts Mr. Eury would work on initially as an account executive (*i.e.,* she "made a list" of accounts for him).

Mr. Goodman subsequently left his job and was replaced as General Manager by Richard Rakovan, who became Plaintiff's immediate supervisor. By late 1993, however, Greater Media became dissatisfied because the stations were not hitting their target with respect to profitability, as acknowledged by Plaintiff, and Mr. Rakovan was fired.

In early 1994, Robert Longwell was hired to be the new General Manager. During his first several months on the job, Mr. Longwell undertook a reorganization of the stations, and made a number of personnel changes with respect to both programming and sales. With respect to WWRC–AM, Mr. Longwell fired the Program Director, Peter Laufer. With respect to the programming at WGAY–FM, at least three males who worked as on-air personalities were fired, one of whom was replaced by a woman, and another by a male/female team.

With respect to the sales department, Mr. Longwell created the job of General Sales Manager, to whom sales managers of both stations would report. After interviewing both internal and external candidates for this new position (including Plaintiff and Dennis Reese, sales manager of the AM station), Mr. Longwell hired one of the external candidates, Warren Wright, who previously had worked for Mr. Longwell at another station. Under this arrangement, Plaintiff, as Local Sales Manager for the FM, and Mr. Reese, as Local Sales Manager for the AM, reported to Mr. Wright.

Mr. Wright testified that upon becoming General Sales Manger, he interviewed the sales staffs of Plaintiff and Mr. Reese, and reviewed the stations' rankings in the Hungerford Report.[1] The Hungerford Report at that time ranked WGAY–FM at or near the bottom of the Washington, D.C. market.

---

**1.** The Hungerford Report serves as an industry "report card" on radio station sales managers, by rating the revenue performance of radio stations relative to their listener ratings.

Mr. Wright decided to replace Plaintiff as FM sales manager, and he hired Robert Deutsch, whom he had known previously as an effective sales manager, to be the new FM Local Sales Manager. Plaintiff was offered the opportunity to remain with the station as an account executive on the sales staff, which she accepted. Upon becoming an account executive, Plaintiff was given the account list of a disabled (legally blind) male over the age of forty who was fired. The list of accounts given to Plaintiff reportedly was significantly better (*i.e.*, had potential to generate higher commissions) than the list given by Plaintiff to Mr. Eury, when Mr. Eury went from being sales manager to account executive.

Plaintiff worked as an account executive on the FM sales staff from March 1994 until January 1995, when she submitted a letter of resignation to Mr. Wright, advising that she would be leaving in two weeks. On February 1, 1995, Plaintiff began a new job as sales manager for radio station WNAV. Plaintiff admits that, as reflected in her appointment book, prior to submitting her letter of resignation she had met on several occasions with Constance Adams, the President and General Manager of the company that operated WNAV. Plaintiff and Ms. Adams both testified that Ms. Adams encouraged Plaintiff to come work at WNAV, where in addition to earning salary and commission, Plaintiff could become a shareholder with an ownership interest in the company.

## II. *DISCUSSION*

### A. STANDARD OF REVIEW

It is well established that a motion for summary judgment will be granted only if there exists no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The moving party bears the burden of showing that there is no genuine issue as to any material fact. Fed.R.Civ.P. 56(c); *Pulliam Inv. Co. v. Cameo Properties*, 810 F.2d 1282, 1286 (4th Cir.1987) (citing *Charbonnages de France v. Smith*, 597 F.2d 406, 414 (4th Cir.1979)). If there clearly exist factual issues "that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party," then summary judgment is inappropriate. *Anderson*, 477 U.S. at 250, 106 S.Ct. 2505; *see also Pulliam Inv. Co.*, 810 F.2d at 1286; *Morrison v. Nissan Motor Co., Ltd.*, 601 F.2d 139, 141 (4th Cir.1979); *Stevens v. Howard D. Johnson Co.*, 181 F.2d 390, 394 (4th Cir.1950). In addition, "summary judgment is inappropriate even if merely the inferences to be drawn from the facts are in dispute." *United States ex rel. Milam v. Regents of University of California*, 912 F.Supp. 868, 874 (D.Md.1995); *see also Morrison*, 601 F.2d at 141 ("Summary judgment under Rule 56, Fed.R.Civ.P. should be granted only where it is perfectly clear that there is no dispute about either the facts of the controversy or the inferences to be drawn from such facts."); *Charbonnages*, 597 F.2d at 414.

When ruling on a motion for summary judgment, the court must construe the facts alleged in the light most favorable to the party opposing the motion. *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962); *Gill v. Rollins Protective Servs. Co.*, 773 F.2d 592, 595 (4th Cir. 1985). A party who bears the burden of proof on a particular claim must factually support each element of his or her claim. "[A] complete failure of proof concerning an essential element ... necessarily renders all other facts immaterial." *Celotex Corp.*, 477 U.S. at 323, 106 S.Ct. 2548. Thus, on those issues on which the nonmoving party will have the burden of proof, it is his or her responsibility to confront the motion for summary judgment with an affidavit or other similar evidence. *Anderson*, 477 U.S. at 256, 106 S.Ct. 2505.

In *Celotex Corp.*, the Supreme Court stated:

> In cases like the instant one, where the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the "pleading, depositions, answers to interrogatories, and admissions on file." Such a motion, whether or not accompanied by affidavits,

will be "made and supported as provided in this rule," and Rule 56(e) therefore requires the nonmoving party to go beyond the pleading and by her own affidavits, or by the "depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial." *Celotex Corp.*, 477 U.S. at 324, 106 S.Ct. 2548. However, " 'a mere scintilla of evidence is not enough to create a fact issue.' " *Barwick v. Celotex Corp.*, 736 F.2d 946, 958–59 (4th Cir. 1984) (quoting *Seago v. North Carolina Theatres, Inc.*, 42 F.R.D. 627, 632 (E.D.N.C. 1966), *aff'd*, 388 F.2d 987 (4th Cir.1967), *cert. denied*, 390 U.S. 959, 88 S.Ct. 1039, 19 L.Ed.2d 1153 (1968)). There must be "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249–50, 106 S.Ct. 2505 (citations omitted).

## B. THE CLAIMS

### 1. Discriminatory Demotion

Plaintiff alleges that she was discriminatorily demoted, apparently with regard both to the decision to make her FM Local Sales Manager reporting to Mr. Wright as General Sales Manager, and to the decision to make her an account executive. Plaintiff asserts that these employment actions were taken against her because of her gender, age, and/or disability. A plaintiff in a Title VII case may prove discriminatory demotion through either direct proof of discriminatory intent, or through the indirect, burden-shifting method of proof set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) and *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). The burden-shifting framework also applies in ADEA cases, *see, e.g., Burns v. AAF–McQuay, Inc.*, 96 F.3d 728, 731 (4th Cir.1996) (citing *Tuck v. Henkel Corp.*, 973 F.2d 371, 374–75 (4th Cir.1992), *cert. denied*, 507 U.S. 918, 113 S.Ct. 1276, 122 L.Ed.2d 671

(1993)), *cert. denied*, —— U.S. ——, 117 S.Ct. 1247, 137 L.Ed.2d 329 (1997), and ADA cases, *see, e.g., Ennis v. National Ass'n of Business & Educational Radio*, 53 F.3d 55, 59 (4th Cir.1995), as well. Plaintiff has presented no direct evidence of discrimination, and, therefore, must rely on circumstantial evidence. Under this approach, a plaintiff may establish a prima facie case of discriminatorily motivated demotion by proving that (1) plaintiff is a member of a protected class; (2) plaintiff was demoted; (3) at the time of the demotion he or she was performing his or her job at a level that met his or her employer's legitimate expectations; and (4) following the demotion, the plaintiff was replaced by someone of comparable qualifications outside the protected class. *Burns*, 96 F.3d at 731 (citing *Tuck*, 973 F.2d at 375).[2] The burden then shifts to the defendant to produce evidence of a legitimate, non-discriminatory reason for the demotion. See *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 507, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). If the defendant's proffered reasons are facially legitimate and nondiscriminatory, the presumption of unlawful discrimination falls away. *St. Mary's*, 509 U.S. at 510, 113 S.Ct. at 2748–49. The burden then shifts to the plaintiff to prove that the employer's stated reason was a pretext for discrimination. *Burns*, 96 F.3d at 731 (citing *Tuck*, 973 F.2d at 375). The burden of persuasion remains with the plaintiff throughout. *Id.*

As to the first challenged action, Plaintiff's switch from "General Sales Manager" to "Local" or FM Sales Manager, it appears as though Plaintiff cannot even establish a necessary element of the prima facie case, namely, that she was demoted. Although Plaintiff referred to herself, and perhaps was referred to by others as "General Sales Manager," the testimony of Mr. Longwell makes clear that no such position, as that term is generally understood in the radio business, actually existed at WGAY/WWRC before he came on board as General Manager. Mr. Longwell *created* the position

---

**2.** In an ADEA case, the plaintiff apparently need not be replaced by someone outside the protected class (*i.e.*, someone under 40), provided that the replacement is younger than the plaintiff. *See*

*Burns*, 96 F.3d at 731 n. 1 (citing *O'Connor v. Consolidated Coin Caterers Corp.*, 517 U.S. 308, 312, 116 S.Ct. 1307, 1310, 134 L.Ed.2d 433 (1996)).

of General Sales Manager in charge of sales for *both* stations and filled that position with Mr. Wright. Therefore, it was simply a reorganization rather than a demotion that led Plaintiff to become known as the "Local" or FM Sales Manager.

Assuming, *arguendo*, that Plaintiff was demoted, she has put forth no evidence of discriminatory animus or pretext to rebut Defendants' nondiscriminatory explanation. As the Fourth Circuit recently explained the pretext issue:

[I]f the plaintiff offers nothing to disprove the defendant's nondiscriminatory explanations, the explanations' weakness alone is insufficient to create an issue of pretext. Instead the burden of production returns to the plaintiff to present affirmative evidence of [discriminatory] animus.... A showing of pretext demands the same type of proof—affirmative evidence of discriminatory intent—required under traditional principles, but not necessarily the same quantum. Affirmative proof that alone does not suffice under the traditional scheme may, when combined with the weakness of the defendant's asserted nondiscriminatory reasons, create a prima facie case of pretext.

*Burns*, 96 F.3d at 732.

■ The decision to bring in Mr. Wright as General Sales Manager was part of a large reorganization effort undertaken by Mr. Longwell, and the evidence shows that Mr. Longwell selected Mr. Wright because he believed him to be qualified and had worked with him before in the past. This explanation on its face does not appear to be "weak," and Plaintiff has not challenged it factually, nor has Plaintiff put forth any evidence whatsoever that would suggest that Mr. Longwell's decision to have Mr. Wright function as the General Sales Manager with Plaintiff reporting to Mr. Wright on the FM side and Mr. Reese reporting to Mr. Wright on the AM side, had anything to do with Plaintiff's gender, age, or any alleged disability.[3]

■ As to the second challenged employment action, the decision to replace Plaintiff as Local FM Sales Manager with Mr. Deutsch and make Plaintiff an account executive, it is not clear that Plaintiff can satisfy the third element of the prima facie case, namely, that at the time she was demoted she was performing her job at a level that met her employer's legitimate expectations. Mr. Wright testified, and Plaintiff does not dispute, that Mr. Wright interviewed the members of Plaintiff's sales team and evaluated WGAY–FM's ranking in the Hungerford Report. The interviews revealed dissatisfaction with Plaintiff as a manager, and the Hungerford Report revealed that the station was at the bottom of the market in terms of revenue-to-ratings ratio.

Again, assuming, *arguendo*, that Plaintiff can establish a prima facie case of discrimination, she has not demonstrated that there is a genuine issue of material fact on the question of pretext. As mentioned immediately above, Defendants' proffered reason for removing her from her sales manager position was performance related (Plaintiff's relationship with her sales staff and the station's ranking in the Hungerford Report). Mr. Wright testified that he hired Mr. Deutsch to replace Plaintiff as Local FM Sales Manager because he had known Mr. Deutsch previously to be an effective manager. Again, Plaintiff does not dispute the factual bases for these reasons. The only "evidence" of pretext that Plaintiff puts forth is so-called "comparative evidence." *See Reeves v. Thigpen*, 879 F.Supp. 1153, 1176 (M.D.Ala.1995) ("Comparative evidence is that which shows employees who were not members of the protected class were treated differently"; noting that a plaintiff may use comparative evidence to show the existence of a genuine issue of material fact on the question of pretext and thereby defeat a defense summary judgment motion). Plaintiff argues

---

**3.** When asked repeatedly at her deposition why she believed that various actions were taken because of, or people were motivated by, her gender, age, or disability, Plaintiff responded with remarks such as, "That's my feeling," "Just the fact that it happened to me," and "I'm not a lawyer." Plaintiff's Deposition, pp. 380, 609, & 638. Setting aside, for the moment, the question of what would be legally relevant evidence of discrimination, Plaintiff cannot even articulate the basis for *her own personal belief* that she was discriminated against on any of these bases.

that the AM station also was performing poorly and that Mr. Reese was not similarly demoted from sales manager to account executive. Plaintiff has introduced evidence that the revenues of the FM station actually were higher than those of the AM station during the same time period. Such evidence misses the mark, however. The relevant consideration in evaluating the performance of a sales manager, according to Mr. Wright, is not total revenue, but rather the so-called "power rating" (the ratio of revenue to ratings) by which stations are ranked in the Hungerford Report. This ratio takes into account the ratings, and therefore does not penalize a sales manager for poor listener ratings, which are beyond his or her control (when a station's listener ratings are low, it is obviously more difficult to generate sales revenue from the sale of advertising time). During the relevant time period, the AM station had a higher power rating than the FM station, and Mr. Reese was thus outperforming Plaintiff as a sales manager by this objective measurement. Therefore, Plaintiff's evidence as to Mr. Reese does not show pretext. The evidence shows that Plaintiff's demotion (assuming it was that) to account executive was part of the restructuring that came about when Mr. Longwell took over as general manager. Mr. Longwell came and brought in a new manager, Mr. Wright. Mr. Wright then came in and brought in a new manager, Mr. Deutsch. The evidence in the record shows that it is a common occurrence in the radio business for new managers to bring in new management teams. Indeed, that is how Plaintiff herself came to be employed at WGAY–FM—she was brought in by a new General Manager, Mr. Goodman, and she replaced Mr. Eury, who had been sales manager under the previous General Manager. What happened to Plaintiff is the same thing that happened to Mr. Eury, and Plaintiff has put forth no evidence tending to show that what happened to her was motivated by gender-, age-, or disability-based animus.

Because Defendants have proffered legitimate, nondiscriminatory reasons for the employment decisions about which Plaintiff complains, and because Plaintiff has not shown that there is a genuine issue of material fact on the question of pretext, summary judgment will be granted in favor of Defendants on Plaintiff's discriminatory demotion claims. Because Plaintiff's discriminatory demotion claims fail, she is not entitled to reinstatement, backpay, or any other relief with respect to those claims.

## 2. Discriminatory Pay Inequity

Plaintiff recites no facts in her complaint in support of her assertion of "pay inequity." Furthermore, although Plaintiff filed three charges of discrimination with the EEOC, none mentions an issue of pay inequity. At her deposition, Plaintiff explained that her complaint of pay inequity arises from the alleged failure of management to pay her an adjustment to her commission that was promised to her, and the fact that she believes that Mr. Reese did receive the promised adjustment. *See* Plaintiff's Deposition at 712–15. Plaintiff testified that she asked Mr. Reese whether he had received it, and he replied that he had not. Plaintiff has no evidence that he did receive the disputed money, but rather she insists that he did because he is a "rotten liar." *See id.* at 390–91, 793. Defendants in support of their summary judgment motion have supplied evidence indicating that for the year in question, Plaintiff and Mr. Reese received virtually identical compensation, and, indeed, Plaintiff's total compensation was several hundred dollars higher. Plaintiff fails entirely to address this evidence or Defendants' arguments on this point in her opposition brief.

Plaintiff's failure to raise this claim with the EEOC and thereby exhaust her administrative remedies with respect to her claim of pay inequity deprives this court of jurisdiction over this claim, and justifies the entry of summary judgment against her. *See, e.g., Dennis v. County of Fairfax*, 55 F.3d 151, 156 (4th Cir.1995). Assuming, *arguendo*, that Plaintiff's pay inequity claim fairly can be considered to be encompassed by her EEOC charges, Defendants still are entitled to summary judgment on this claim. Plaintiff points to no evidence whatsoever of any pay inequity, and the uncontested evidence shows that she and Mr. Reese received

the same compensation for the year in question.

### 3. Denial of Reasonable Accommodation

Plaintiff alleges that she is a person with a disability affecting her neck. Plaintiff testified that she has a condition in her neck known as fibrositis, which from time to time results in pain and stiffness in the neck and shoulders.[4] Plaintiff apparently had this condition when she came to work at WGAY–FM, but she did not check off the boxes on her application or the employer's voluntary affirmative action sheet to indicate that she was a person with a disability.

In February 1994, when Plaintiff moved from her management position to a position as an account executive, she relocated from the sales manager's office to a cubicle of the type used by the sales staff. According to Plaintiff's Complaint, because of this move she "lost the use of her office which had been fitted with equipment necessary to enable Plaintiff to perform her job, given her disability." The Complaint further alleges that when, after this move, Plaintiff renewed her request for reasonable accommodation of her disability, her request was refused. This allegation, however, directly contradicts her statement in her affidavit filed with the EEOC in October 1994, in which she stated that she did "not need any additional accommodations." In addition, Plaintiff testified that the only "accommodations" in her old office were a headset phone, an orthopaedic chair, and a heater; Plaintiff also testified that when she moved to her cubicle, she took her headset and chair with her. Furthermore, the uncontradicted evidence shows

that Plaintiff never told her supervisor that a draft in her cubicle was causing her pain or discomfort, and that she never asked to be moved to another location. *See Rhoads v. Federal Deposit Insurance Corp.,* 956 F.Supp. 1239, 1248, 1997 WL 87982, *7 (D.Md.1997) ("[The employer] should not be held liable for an accommodation which it was never requested to make. 'The E.E.O.C. regulations provide that "[i]n general . . . it is the responsibility of the individual with a disability to inform the employer that an accommodation is needed" ' ") (quoting *Bryant v. Better Business Bureau of Greater Maryland, Inc.,* 923 F.Supp. 720, 737 (D.Md.1996) (quoting in turn 29 C.F.R. § 1630.9, at 414)).

■■■ Defendants argue, and the court agrees, that they are entitled to summary judgment on this claim because Plaintiff did not present the claim to the EEOC. The EEOC has jurisdiction over the portions of the ADA dealing with employment discrimination, and a jurisdictional prerequisite to bringing a federal action is filing an administrative charge with the EEOC. *See, e.g., Johnson v. Maryland,* 940 ·F.Supp. 873 (D.Md.1996) The scope of a civil action in federal court for employment discrimination, including claims of failure to accommodate pursuant to the ADA, is limited to the administrative investigation that could "reasonably be expected to follow" from the administrative charges of discrimination. *See id.* at 876 (quoting *Chisholm v. United States Postal Serv.,* 665 F.2d 482, 491 (4th Cir.1981)). In her EEOC filings, Plaintiff alleged that Defendants demoted her and retaliatorily constructively discharged her on the basis of her

---

4. The ADA defines "disability" as "a physical or mental impairment that substantially limits one or more of the major life activities of such individual." 42 U.S.C. § 12102(2). Defendants note briefly that they believe that Plaintiff has failed to show that she is a person with a disability under the law, and Plaintiff does not respond to this argument.

Plaintiff testified that she sometimes wore a collar on her neck at work and that because of a draft from the window in her cubicle she suffered pain which affected everything that she did, but that she always performed her job nonetheless. Additionally, the evidence shows that Plaintiff is an avid scuba diver, and a licensed

scuba instructor. Plaintiff's medical records show that she had neck surgery while in the Defendants' employ, and that by March 31, 1994 she was "feeling great," and was making good progress recovering from this surgery. However, Plaintiff then injured her neck on a scuba diving trip in May 1994.

Because Defendants are entitled to summary judgment on this and Plaintiff's other ADA claims on other grounds, however, it is not necessary to reach the issue of whether or not Plaintiff qualifies as a person with disabilities under the ADA, and the court will assume for purposes of this motion that she does.

disability. Plaintiff did not allege that Defendants failed to accommodate her disability, a separate and distinct theory of liability, and indeed explicitly stated that she did not need any additional accommodations. In these circumstances, Plaintiff's current allegation of failure to accommodate cannot be said to be "reasonably expected to follow" from the charges filed with the EEOC. Defendants therefore are entitled to summary judgment on this claim.

### 4. Constructive Discharge

Plaintiff attempts to characterize her voluntary resignation to take another job as a constructive discharge. In her Complaint, she simply states that her "involuntary resignation" was the product of "willful and unlawful discrimination." As the Complaint does not mention retaliation, it appears that Plaintiff asserts that the constructive discharge was the result of gender, age, and/or disability discrimination. Because her third filing with the EEOC, however, alleges retaliatory discharge, and because Plaintiff's opposition brief makes reference to "reprisal," it may be assumed that Plaintiff also believes that she was constructively discharged in retaliation for filing her first EEOC charge. it really does not matter, however, under which theory (or both) Plaintiff wishes to proceed because Plaintiff has not put forth sufficient evidence that she was constructively discharged to survive summary judgment on this claim.

■ It is well-established that a plaintiff must prove the following four elements to maintain a claim of unlawful discharge: (1) plaintiff is a member of a protected class; (2) plaintiff was qualified for the job and performed the job satisfactorily; (3) in spite of plaintiff's qualifications and performance, plaintiff was discharged; and (4) the position remained open to similarly qualified applicants after plaintiff's dismissal. *Carter v. Ball*, 33 F.3d 450, 458–59 (4th Cir.1994). The discharge in prong three can be either actual or constructive. *Id.* at 459. The doctrine of constructive discharge is a judicially created response to the inability of plaintiffs (suing under Title VII prior to the 1991 amendments) to recover for emotional distress or medical expenses. *Eaglin v. WGAY/WWRC Radio,* 1996 WL 1061102, *5, Civil Action No. CCB–94–3202, p. 13 (D.Md.1996) (citing *Chambers v. American Trans Air, Inc.,* 17 F.3d 998, 1005 (7th Cir.), *cert. denied,* 513 U.S. 1001, 115 S.Ct. 512, 130 L.Ed.2d 419 (1994)). Under the constructive discharge doctrine, a plaintiff may resign and sue for reinstatement and back pay as if she had been fired. *Id.* The purpose of the doctrine thus is limited, and a plaintiff must show more than difficult or unpleasant working conditions coupled with a resignation in order to recover. See id. As the Fourth Circuit has explained:

> The doctrine of constructive discharge protects an employee "from a calculated effort to pressure him into resignation through the imposition of unreasonably harsh conditions, in excess of those faced by his coworkers." The employee "is not, however, guaranteed a working environment free of stress." Dissatisfaction with work assignments, a feeling of being unfairly criticized, or difficult or unpleasant working conditions are not so intolerable as to compel a reasonable person to resign.

*Carter,* 33 F.3d at 459 (quoting *Bristow v. Daily Press, Inc.,* 770 F.2d 1251, 1255 (4th Cir.1985), *cert. denied,* 475 U.S. 1082, 106 S.Ct. 1461, 89 L.Ed.2d 718 (1986), and citing *Stetson v. NYNEX Serv. Co.,* 995 F.2d 355, 360 (2d Cir.1993)).

■ To maintain a claim for constructive discharge, "a plaintiff must show that his or her *employer deliberately* ma[de] an employee's working conditions intolerable and thereby force[d] him to quit his job." *Martin v. Cavalier Hotel Corp.,* 48 F.3d 1343, 1350 (4th Cir.1995) (internal quotations and citation omitted). "A plaintiff alleging constructive discharge must therefore prove two elements: deliberateness of the employer's action, and intolerability of the working conditions." *Bristow,* 770 F.2d at 1255.

■ An employer acts deliberately for purposes of a constructive discharge claim if its actions "were intended by the employer as an effort to force the employee to quit." *Martin,* 48 F.3d at 1354 (quoting *Paroline v. Unisys Corp.,* 879 F.2d 100, 114 (4th Cir.

1989) (Wilkinson, J. dissenting), *vacated in part,* 900 F.2d 27 (1990) (en banc) (adopting panel dissenting opinion)). "Deliberateness can be demonstrated by actual evidence of intent by the employer to drive the employee from the job, or circumstantial evidence of such intent, including a series of actions that single out a plaintiff for differential treatment," *Johnson v. Shalala,* 991 F.2d 126, 131 (4th Cir.1993) (citing *EEOC v. Clay Printing Co.,* 955 F.2d 936, 944–46 (4th Cir.1992)), *cert. denied,* 513 U.S. 806, 115 S.Ct. 52, 130 L.Ed.2d 12 (1994), or "a failure to act in the face of known intolerable conditions." *Martin,* 48 F.3d at 1354 (quoting *Paroline,* 879 F.2d at 114). In this regard, relevant considerations are whether the employee attempted to air her grievances with supervisors or other management prior to resigning, *see Eaglin,* 1996 WL 1061102, at *7, Civil Action No. CCB–94–3202, at 15 (citing *Ugalde v. W.A. McKenzie Asphalt Co.,* 990 F.2d 239, 243 (5th Cir.1993) (noting in a constructive discharge case that the plaintiff "attempted to complain about [racist comments] on only one occasion ... [but] did not mention that the supervisor used ethnic slurs")); *Levendos v. Stern Entertainment, Inc.,* 909 F.2d 747, 751 (3d Cir.1990) ("We hold that although notice to executive management is a factor to be considered in a claim of constructive discharge, a requirement of notice is not a *sine qua non*"); *cf. Cavalier Hotel,* 48 F.3d at 1354 (referring to employer's failure to act "in the face of *known* intolerable conditions") (emphasis added); and whether the employee has given the employer a chance to take corrective action before she resigns, *see Dennis,* 55 F.3d at 156 (in a case brought under 42 U.S.C. § 1981 and Title VII, concluding that "where an employer implements timely and adequate corrective measures after harassing conduct has come to its attention, vicarious liability should be barred regardless of the specific motivation for the wrongdoing or the particular cause of action"); *West v. Marion Merrell Dow, Inc.,* 54 F.3d 493, 498 (8th Cir.1995) ("An employee who quits without giving her employer a reasonable chance to work out a problem is not constructively discharged"); *Garner v. Wal–Mart Stores, Inc.,* 807 F.2d 1536 (11th Cir. 1987) (noting that plaintiff "did not give Wal–Mart a chance" to give her relief); *Raley v. Board of St. Mary's County Comm'rs,* 752 F.Supp. 1272, 1279 (D.Md.1990) ("The Board did not fail to act. Raley's internal sex discrimination appeal was filed only two months before she left and an investigation was begun immediately.... [W]hen she submitted her letter of resignation ... a possible transfer was in the works").

Intolerability of working conditions is "assessed by the objective standard of whether a 'reasonable person' in the employee's position would have felt *compelled* to resign—that is, whether he would have had *no choice* but to resign." *Blistein v. St. John's College,* 74 F.3d 1459, 1468 (4th Cir. 1996) (citing *Bristow,* 770 F.2d at 1255). The law does not allow an employee's subjective perceptions of what she thinks her employer is doing or might do govern a claim of constructive discharge. *See Raley,* 752 F.Supp. at 1279 (citing *Bristow,* 770 F.2d at 1254–55); *see also Goldsmith v. Mayor and City Council of Baltimore,* 987 F.2d 1064, 1072 (4th Cir.1993). "Part of an employee's obligation to be reasonable is an obligation not to assume the worst and not to jump to conclusions too fast." *Smith v. Goodyear,* 895 F.2d 467, 473 (8th Cir.1990) (quoting *Garner,* 807 F.2d at 1539).

In this case, Plaintiff has not put forth sufficient facts from which a factfinder at trial could find either deliberateness or intolerability. Plaintiff relies on a series of conclusory allegations in support of her contention that her employer intended to force her from the job: "by their treatment of her, defendants forced her to abandon her career with defendants, first by demoting her from sales manager to account executive, and then continuing by their constant harassment and interference with the performance of her job.... [B]eginning no later than the summer of 1994, defendants systematically began interfering with plaintiff's sales efforts, criticizing her for not working harder, criticizing her for working as hard as she did and thereby showing poor judgment, blaming her for actions in which she was not involved, and threatening her with discharge." Plaintiff's Opposition, pp. 11–12. Because Plaintiff has responded to Defendant's summary judg-

ment motion largely by reiterating the allegations in her complaint, the court notes that it has read the entire record of evidence in this case (very little of which was submitted by Plaintiff), and does not believe that any of the incidents alluded to by Plaintiff in her complaint or opposition brief demonstrate that Defendants engaged in a course of conduct designed to force Plaintiff to leave. The record reveals nothing more than typical inter-office disputes, such as mild reprimands and performance evaluations about which employer and employee disagree, and performance expectations about which employer and employee disagree. It is uncontradicted that at one point Plaintiff asked her immediate supervisor, Mr. Deutsch, whether he wanted her to leave, and he replied that he did not. It is also undisputed that Plaintiff never informed anyone in management that she felt as though she was under any discriminatorily-motivated duress by her employer. The only evidence of any mention by Plaintiff of discrimination is a memo that Plaintiff prepared on December 4, 1994, in which she indicated that if her performance goals were different from those of Mr. Eury, she would feel as though she "was being treated in an unequal and disparate fashion." Plaintiff resigned just one month later, and there is no evidence that Mr. Eury's goals were in fact different, or that Defendants failed satisfactorily to respond to Plaintiff's concern in this regard. In sum, the court is satisfied that Plaintiff has not adequately set forth evidence that if true would support a finding of deliberateness, and that it is not necessary to address individually each incident alluded to.

Even assuming, *arguendo*, that Plaintiff were able to establish deliberateness, Defendants still are entitled to summary judgment on Plaintiff's constructive discharge claim because Plaintiff falls far short of making a credible showing of intolerability. Plaintiff has complained that she was demoted, that Defendants unfairly criticized her work and set unfair goals, that Defendants unfairly reprimanded her and threatened her with termination, and that Defendants took away her space heater thereby adding to her physical discomfort. Again, Plaintiff basically repeats and relies

on allegations in her Complaint, leaving the court to sort through the voluminous pages of deposition testimony and other evidence on its own. The court finds that there is not evidence in the record which, if true, would allow a jury to find that a reasonable person in Plaintiff's position would have felt that she had no choice but to resign.

The law does not support a finding of constructive discharge merely because an employee has been subject to a demotion, *see Shealy v. Winston*, 929 F.2d 1009, 1013 (4th Cir.1991), and, indeed, the evidence shows that Mr. Eury, who was demoted in 1992 from the position of sales manager when Plaintiff came in to take over that position, continued to be employed by Defendants for years thereafter. Furthermore, an employee's dissatisfaction with work assignments does not show constructive discharge. *See Carter*, 33 F.3d at 459; *Stetson*, 995 F.2d at 361. The law does not permit a constructive discharge to be proved merely by evidence that an employee disagreed with the employer's criticism of the employee's work. *See Spence v. Maryland Casualty Co.*, 995 F.2d 1147, 1156 (2d Cir.1993). A stress-related health condition is not sufficient proof for a claim of constructive discharge. *See id.* An employer's inability satisfactorily to accommodate a disability does not suffice to show a constructive discharge, *see Johnson*, 991 F.2d at 130, and, as discussed above, it is undisputed that Plaintiff never requested that she be moved from her cubicle, and the evidence shows that Defendants had to remove *all* space heaters from *all* employees, pursuant to an order from the building owner.

What becomes clear from reading Plaintiff's opposition brief is that her constructive discharge theory basically is as follows: she thought that if she remained on the job that she would be fired, and rather than waiting to be fired, and in order to avoid having to admit to future prospective employers that she had been terminated, she resigned. Plaintiff argues that "[w]here the employer makes manifest its intent to fire an employee, the employee has been constructively discharged. She need not wait for the axe to fall." Plaintiff's Opposition at 12. In support of this proposition, Plaintiff cites a case dealing with "enforced idleness," which is not

implicated here, and a few cases in which the employee was told by the employer that he or she would be fired after a specified time period. In this case, Plaintiff was not told that she would be fired,[5] and when she asked whether her supervisor wanted her to leave, he replied that he did not. Plaintiff wants to rely on her subjective belief that she would be fired if she remained on the job in support of her right to resign and still be entitled to all the legal remedies afforded those who are fired in violation of the federal employment anti-discrimination statutes. This position runs counter to the law of this circuit, see, *e.g., Bristow,* 770 F.2d at 1254–55; *Raley,* 752 F.Supp. at 1279, and is not in keeping with the limited purpose of the constructive discharge doctrine.

Because Plaintiff's constructive discharge claim must fail, Plaintiff is not entitled to back pay or any other damages resulting from her leaving her employment with Defendants.

## III. *CONCLUSION*

For the foregoing reasons, Defendants' motion for summary judgment is GRANTED.

---

**5.** As for Plaintiff's allegation that she was repeatedly threatened with termination, the record reveals only two instances, one oral and one in writing, in which "termination" was mentioned to Plaintiff (a 11/10/95 meeting with Mr. Deutsch, and a 12/04/95 memorandum from Mr. Deutsch to Plaintiff). On both occasions, it was stated that failure to correct the dramatic drop in Plaintiff's sales performance (specifically, failure to generate new business and failure to generate a single sale out of over forty "qualified prospects") may result in Plaintiff being terminated.