Freda OVERSTREET

v.

CALVERT COUNTY HEALTH DEPARTMENT,

and

State of Maryland, Department of Health and Mental Hygiene

and

Board of Commissioners of Calvert County

No. CIV. CCB–99–2027.

United States District Court, D. Maryland.

March 7, 2002.

Joe C. Ashworth, Law Office, Leonard-town, MD, for Plaintiff.

Anthony Keith Waters, J. Joseph Curran, Jr., Cynthia Grams Peltzman, Office of the Attorney General, Baltimore, MD, for Defendant.

## *MEMORANDUM*

BLAKE, District Judge.

Now pending before this Court is a motion for summary judgment pursuant to Fed.R.Civ.P. 56 brought by defendant Board of County Commissioners of Calvert County, Maryland ("BCC"). Also pending is a motion to dismiss brought by the Maryland Department of Health and Men-

tal Hygiene ("DHMH") and the Calvert County Health Department ("CCHD"). Plaintiff Freda Overstreet brought this civil action alleging that she was discriminated against on the basis of her "addiction" to marijuana in violation of the Americans with Disabilities Act (ADA). Plaintiff filed her initial complaint in July of 1999 against CCHD. After surviving a motion to dismiss,[1] plaintiff filed an amended complaint in June of 2000 alleging identical ADA violations by CCHD, DHMH, and the Board. Defendants CCHD and DHMH filed an unopposed motion to dismiss on June 4, 2001. Because plaintiff has conceded that her claims against CCHD and DHMH must be dismissed, the motion will be granted. (*See* Pl.'s Opp. to Summ. J. at 2 n. 1.) Defendant BCC filed the present motion for summary judgment on June 8, 2001, and for the reasons set forth below, the court will grant BCC's motion. This matter has been fully briefed and no hearing is necessary. *See* Local Rule 105.6.

### BACKGROUND

Freda Overstreet is an addictions counselor certified by the State of Maryland. (Compl. at ¶ 12; Def.'s Mem. in Supp. of Summ. J. Ex. 4 at 17–18, 119–120.)[2] She alleges that she is a recovering marijuana "addict" who has not used the drug since 1980. (Def.'s Mem. in Supp. of Summ. J. Ex. 4 at 18; Pl.'s Opp. to Summ. J. at 4.)[3] In May 1994, she began work as a yearly contractual addictions counselor for CCHD at the New Leaf Drug Abuse Treatment Program ("New Leaf"), (Pl.'s Opp. to Summ. J. at 2), while also maintaining a private practice. (Compl.. at ¶¶ 13–14.) During plaintiff's tenure at New Leaf, the program apparently shifted from being a state-funded program controlled by CCHD to being a program controlled by BCC and called Calvert County Substance Abuse Services ("CSAS"). (Def.'s Mem. in Supp. of Summ. J. Ex. 7 at 9–11; Pl.'s Opp. to Summ. J. at 3.) Plaintiff has sued BCC under a theory of respondeat superior based on BCC's alleged control of CSAS.[4]

Plaintiff's contract was renewed annually through the end of the 1997 fiscal year. (Pl.'s Opp. to Summ. J. Ex. 4 at ¶¶ 5,8.) According to the contract in force during the relevant period of this lawsuit, she was to be employed as an "Addictions Counselor III" to work three days per week. (Def.'s Mem. in Supp. of Summ. J. Ex. 13–14.) Plaintiff initially was quite successful in her work; not only was Overstreet's contract renewed from year-to-year, but she was evaluated as demonstrating a "superior" level of performance in her conduct as an addictions counselor. (*Id.,* Ex. 16.) By 1996, plaintiff was carrying a heavy caseload of 70 to 80 patients per week in individual and group therapy, and performing case intake and assessment interviews. (*Id.,* Ex. 4 at 30–31, 112.) Plaintiff did not solicit her own clients, but relied on CSAS to refer and schedule them. (*Id.* at 117–18.)

---

**1.** An Order and an accompanying Memorandum denying the motion to dismiss were entered on June 19, 2000.

**2.** Plaintiff did not title her second complaint as an "amended complaint," and thus both share the same title. All citations to a complaint in this Memorandum refer to the Complaint filed on July 3, 2000.

**3.** Plaintiff also states that she has "never abused or been addicted to narcotics, pills, or alcohol." (Pl.'s Opp. to Summ. J. at 4.)

**4.** There is a dispute regarding the exact nature of the reorganization of New Leaf and regarding which government entity or entities employed plaintiff. Resolution of this dispute is not required for the disposition of the pending motion.

The positive association between plaintiff and her employer began to sour in July of 1996. Between July 15 and 18, 1996, plaintiff attended a counseling training program in Salisbury, Maryland. Plaintiff alleges that, upon her return from the training, false rumors were spreading around the office that she had smoked marijuana and had become very drunk while in Salisbury. (Def.'s Mem. in Supp. of Summ. J. Ex. 4 at 32–39.)

Within a few days after plaintiff's return from the training, she alleges that she was told she would be fired unless she took a new, full-time job with CSAS at a new location. (*Id.* at 44–45.) This new full-time position had been the subject of discussions between plaintiff and Brian Lynch, the director of the addictions counseling program at CCHD, since March of 1996. (*Id.* at 33.) Plaintiff alleges that on Friday of the week she was told of this stark choice, Lynch demanded that she decide whether she would take the new position. (*Id.* at 54.) Plaintiff told Lynch that she would have an answer by the following Monday, (*Id.* at 56), and she accepted the new position on Monday, July 21, 1996. (*Id.* at 56–57.)

On the Tuesday after she accepted the new position, however, Lynch informed plaintiff that she would be fired from CSAS entirely unless she resigned first. (*Id.* at 58.) The reason he gave was that plaintiff had been seen drinking the previous weekend. (*Id.* at 59.) Plaintiff refused to quit her job, (*Id.* at 64), and she was subsequently relieved of her duties as counselor. (*Id.* at 67.) In his testimony, Lynch stated that he thought plaintiff may have been drinking regularly outside of her working hours. (Pl.'s Opp. to Summ. J. Ex. 5 at 63–64.) Lynch based his decision to fire plaintiff upon his opinion that because she was in "recovery," she shouldn't "fool around with mind-altering substances." (*Id.* at 66.) According to Lynch, it was his view that plaintiff should not see patients until she had ceased all drinking during her off-work hours. (*Id.* at 70.) Lynch never himself witnessed plaintiff intoxicated and based his conclusions about her on informal reports from coworkers and on an admission from plaintiff that she had consumed a couple of drinks outside of work on one occasion "to make her feel better." (*Id.* at 62–65, 72.)

Plaintiff requested and received a grievance hearing that was held on August 16, 1996, and was presided over by Dr. David L. Rogers. (Def.'s Mem. in Supp. of Summ. J. Ex. 4 at 69–70; Pl.'s Opp. to Summ. J. Ex. 8.) On August 21, 1996, Dr. Rogers ruled that plaintiff was not to be terminated, that she was to continue to perform all of the duties for which she was originally hired, and that she was, to receive monthly job performance reviews. (Pl.'s Opp. to Summ. J. Ex. 8.) Dr. Rogers stated that there was no indication plaintiff's on-the-job performance had been compromised by any substance abuse, that there was no indication her professional judgment had become impaired, that Lynch was not qualified to diagnose plaintiff as being in "relapse" or "denial," and that the alleged use of alcohol by plaintiff did not publicly discredit the health department. (*Id.*) After ruling that plaintiff was not fired, Dr. Rogers sent a special letter to Lynch stating that failure to comply with the ruling by failing to fully reinstate plaintiff would be regarded as insubordination and would result in Lynch's suspension pending termination. (*Id.*, Ex. 9.)

Plaintiff was permitted to see clients after Dr. Rogers' decision. However, she was not offered the new full time position that she had previously agreed to take. (*Id.*, Ex. 4 at ¶ 25.) Her caseload dropped to somewhere between 17 and 25 clients

per week, and she no longer received as many new referrals. (Def.'s Mem. in Supp. of Summ. J. Ex. 4 at 31, 111–15; Pl.'s Opp. to Summ. J. at 18.) Neither was plaintiff assigned new case assessments. (Def.'s Mem. in Supp. of Summ. J. Ex. 4 at 117–19.) Plaintiff also alleges that her relationships with her supervisors and co-workers began to seriously deteriorate at this point. When she expressed concern over a change in office space that adversely affected her, she claims Lynch reacted "flippantly." (*Id.* at 80; Pl.'s Opp. to Summ. J. at 10.) Plaintiff also alleges that after her grievance hearing, both Lynch and another supervisor, Ms. Wise, ceased communicating with her. (Pl.'s Opp. to Summ. J. at 11.) Plaintiff claims that this lack of communication "severely impacted" her ability to do her job. (*Id.; see also id.,* Ex. 4 at ¶ 26.) Furthermore, plaintiff claims that her co-workers ostracized her by refusing to speak with her. (*Id.*) On November 12, 1996, after having received only one monthly evaluation as prescribed by Dr. Rogers, plaintiff submitted her resignation, stating that she did so "in order to take on full-time employment." (*Id.,* Ex. 11.)

In August 1997, plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission (EEOC). (*Id.,* Ex. 12.) On November 25, 1998, the EEOC issued a Determination concluding that there was reasonable cause to believe that the Calvert County Health Department had violated the ADA. (*Id.,* Ex. 13.) After conciliation failed, the Department of Justice issued Overstreet a Right to Sue letter, which she received on April 10, 1999. (Compl. at ¶ 4.) Plaintiff filed her initial complaint on July 8, 1999, and an amended complaint on July 3, 2000, alleging ADA violations against defendants. Specifically, plaintiff claims that she is a qualified person with a disability who was discriminated against by being construc-

tively discharged on the basis of that disability. (*Id.* at ¶¶ 29–35.)

### *Standard of Review*

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment

> shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

The Supreme Court has clarified that this does not mean any factual dispute will defeat the motion:

> By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (emphasis in original).

"The party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of [its] pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Rivanna Trawlers Unlimited v. Thompson Trawlers, Inc.,* 840 F.2d 236, 240 (4th Cir.1988). The court must "view the facts and draw reasonable inferences in a light most favorable to the nonmoving party," *Shaw v. Stroud,* 13 F.3d 791, 798 (4th Cir.1994), but it also must abide by its affirmative obligation to ensure that factually unsupported claims and defenses do not proceed to trial. *Felty v. Graves–Humphreys Co.,* 818 F.2d 1126, 1128 (4th Cir.1987) (citing *Celotex Corp. v. Catrett,*

477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)).

### Analysis

In its motion, defendant BCC argues that summary judgment should be granted because it was not plaintiff's "employer," because plaintiff was not a "person with a disability" under the ADA, and because plaintiff was not constructively discharged from her position. This court finds that summary judgment should be granted for reasons addressed in defendant's third argument: that plaintiff cannot prove she was constructively discharged.

■ Section 12112(a) of the ADA sets forth that "[n]o covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). To make out a prima facie case under this section, plaintiff must show: "(1) that she has a disability, (2) that she is a 'qualified individual' for the employment in question, and (3) that [her employer] discharged her (or took other adverse employment action) because of her disability." E.E.O.C. v. Stowe–Pharr Mills, Inc., 216 F.3d 373, 377 (4th Cir. 2000); see also Baird Ex Rel. Baird v. Rose, 192 F.3d 462, 470 (4th Cir.1999).

In this case there is no dispute that plaintiff is "qualified." Defendant argues, however, that plaintiff has no "disability" as defined under the ADA. A "disability" is defined in 42 U.S.C. § 12102(2) as being: "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such impairment; or (c) being regarded as having such an impairment." Plaintiff has not presented any evidence to suggest that she is disabled under § 12102(2)(A) or (B). She argues, however, that BCC "regarded" her as being disabled. The Supreme Court has held that there are two ways an individual may be "regarded" as being disabled: first, if "a covered entity mistakenly believes that a person has a physical impairment that substantially limits one or more major life activities, or [second, if] a covered entity mistakenly believes that an actual, nonlimiting impairment substantially limits one or more major life activities." Sutton v. United Air Lines, Inc., 527 U.S. 471, 489, 119 S.Ct. 2139, 2149–50, 144 L.Ed.2d 450 (1999). As defendant acknowledges, "working" can constitute a major life activity. See Toyota Motor Mfg., Kentucky, Inc. v. Williams, 534 U.S. 184, —— ——, 122 S.Ct. 681, 692–93, 151 L.Ed.2d 615 (2002). One is "substantially limited" in a major life activity if one is significantly restricted in the ability to perform either a "class of jobs" or a "broad range of jobs in various classes." Hooven–Lewis v. Caldera, 249 F.3d 259, 269 (4th Cir.2001) (citing 29 C.F.R. §§ 1630.2(j)(3)(I)); see also Davis v. University of North Carolina, 263 F.3d 95, 100 (4th Cir.2001) ("When the major life activity under consideration is that of working, the statutory phrase 'substantially limits' requires, at a minimum, that plaintiffs allege they are unable to work in a broad class of jobs.") (quoting Sutton, 527 U.S. at 491, 119 S.Ct. at 2151). Defendant argues that "there is no evidence that [BCC] erroneously believed that Overstreet's perceived alcoholism was severe enough to substantially limit one or more major life activities." (Def.'s Mem. in Supp. of Summ. J. at 18.) In the present case, however, Lynch has essentially admitted that he attempted to fire plaintiff because he believed that a recovering "addict" working as an addictions counselor could not perform adequately so long as

that person was drinking any alcohol, even if the drinking was not during working hours. (*See* Pl.'s Opp. to Summ. J. Ex. 4 at 70.) On the other hand, there is absolutely no evidence that the ultimate decision-maker, Dr. Rogers, regarded plaintiff as disabled. Defendant argues further that assuming, *arguendo,* Lynch believed that plaintiff, by virtue of her perceived addiction, was unable to perform in her job, the job category of "addictions counselor" does not comprise a broad enough class of jobs that an inability to do the job would constitute a substantial limitation of a major life activity. (Def.'s Mem. in Supp. of Summ. J. at 18–20.) It is not necessary to decide this issue, because plaintiff clearly fails on the last prong of her § 12112 ADA claim.

In order to prevail on her claim of constructive discharge, plaintiff must prove two elements. She must demonstrate both that the defendant's alleged actions were deliberately done, with the intent to force her to quit, and that her working conditions were in fact intolerable. *See Taylor v. Va. Union Univ.,* 193 F.3d 219, 237 (4th Cir.1999); *see also Bristow v. The Daily Press, Inc.,* 770 F.2d 1251, 1255 (4th Cir.1985) ("A constructive discharge occurs when 'an employer deliberately makes an employee's working conditions intolerable and thereby forces him to quit his job.' ") (internal citation omitted).

The deliberateness of an employer's action may be proven by actual or circumstantial evidence. *Carter v. Ball,* 33 F.3d 450, 459 (4th Cir.1994). The "intolerability" of work conditions is evaluated in terms of whether a reasonable person would find them so and thus be forced to resign. *Bristow,* 770 F.2d at 1255. As the Fourth Circuit has put it, "[d]issatisfaction

with work assignments, a feeling of being unfairly criticized, or difficult or unpleasant working conditions are not so intolerable as to compel a reasonable person to resign." *Taylor,* 193 F.3d at 237 (*quoting Carter,* 33 F.3d at 459). As stated in *Bristow:*

> [e]very job has its frustrations, challenges and disappointments; these inhere in the nature of work. An employee is protected from a calculated effort to pressure him into resignation through the imposition of unreasonably harsh conditions, in excess of those faced by his co-workers. He is not, however, guaranteed a working environment free of stress.

*Bristow,* 770 F.2d at 1255. Neither may a constructively discharged person have been "unreasonably sensitive to his working environment." *Id.* (*quoting Johnson v. Bunny Bread Co.,* 646 F.2d 1250, 1256 (8th Cir.1981)). Indeed, one who is constructively discharged has been "compelled" to quit because she simply had "no choice" to do otherwise. *See Rankin v. Greater Media, Inc.,* 28 F.Supp.2d 331, 341 (D.Md. 1997).

Had plaintiff's original discharge not been overturned by Dr. Rogers, and assuming that she was "disabled," the third ADA prong could possibly have been satisfied. Similarly, had CSAS permanently stripped plaintiff of her duties, yet allowed her to remain on the payroll, it is conceivable that the prerequisites to a constructive discharge would have been met. However, plaintiff's claim is not founded on the events that led up to the hearing before Dr. Rogers. Indeed, the attempted discharge of plaintiff was fully cured by Dr. Roger's decision in her favor.[5] Plaintiff is

---

5. Plaintiff testified that, after Dr. Rogers' ruling, she was not offered the full-time position that she previously had been forced to accept.

Plaintiff does not argue, however, that this was an actionable adverse employment action in and of itself, but instead argues that it

thus restricted to arguing that after her firing was overturned, the conditions at her place of employment became intolerable, forcing her to quit.

In an effort to prove intolerability, plaintiff sets forth several alleged facts. First, plaintiff alleges that her caseload decreased from approximately 70 to 80 clients a week to somewhere between 16 and 25, that she rarely received new referrals, and that many former clients had "drifted away." (Pl.'s Opp. to Summ. J. at 18; Def.'s Mem. in Supp. of Summ. J. Ex. 4 at 111–19.) Second, she alleges that after her reinstatement, her supervisors Lynch and Wise ceased speaking with her and failed to perform required performance appraisals. (Pl.'s Opp. to Summ. J. at 18, Ex. 4 at ¶ 26.) Third, plaintiff alleges that she was ostracized by her co-workers. (*Id.* at 18, Ex. 4 at 26.) Fourth, plaintiff alleges that Lynch responded "flippantly" when she expressed difficulties caused by office changes resulting from building renovations. (Pl.'s Opp. to Summ. J. at 10; Def.'s Mem. in Supp. of Summ. J. Ex. 4 at 80.) Finally, plaintiff alleges that the full-time position that she had been forced to accept was revoked after her reinstatement. (Pl.'s Opp. to Summ. J. at 18.)

■ Although this court is certain that plaintiff experienced real and possibly significant frustration, it is clear that as a matter of law the facts alleged cannot support a finding that her conditions were intolerable. First, although her workload reduction was significant, in fact her post-reduction load was more in line with her job description than was her pre-reduction workload. (Def.'s Mem. in Supp. of Summ. J. Ex. 15.) At a 20–hour a week pace, plaintiff was only supposed to be seeing 25 clients a week. (*Id.*) Working at

a pace close to the quite reasonable one prescribed in plaintiff's own job description cannot be considered intolerable.

Plaintiff's allegations that her supervisors failed to supervise her and that her colleagues ostracized her also fall short of establishing intolerability. As she was the relapse prevention specialist at CSAS, it is unclear how she would have benefitted from supervision by superiors who did not have her specialized background and were not licensed addictions counselors. Furthermore, in regard to the question of defendant's intent, it is noteworthy that one reason Lynch stopped communicating with plaintiff is that he was transferred and no longer worked in the same facility as she did. (*Id.*, Ex. 5 at 83.) Regarding Overstreet's alleged ostracization, there is simply no evidence that BCC or its agents instructed her co-workers to ignore her. Assuming BCC did so instruct plaintiff's colleagues, this would still not have brought plaintiff's suffering up to the required level of true intolerability. *See Matvia v. Bald Head Island Mgmt., Inc.,* 259 F.3d 261, 273 (4th Cir.2001) (ostracism by co-workers fails to make work place intolerable); *see also Munday v. Waste Mgmt. of N. Am., Inc.,* 126 F.3d 239, 243 (4th Cir.1997) ("In no case in this circuit have we found an adverse employment action to encompass a situation where the employer has instructed employees to ignore and spy on an employee who engaged in a protected activity, without evidence that the terms, conditions, or benefits of her employment were adversely affected."); *cf. Fox v. General Motors Corp.,* 247 F.3d 169, 179 (4th Cir.2001) (finding employer's encouragement of employees to ostracize plaintiff to be one of several factors that caused plaintiff's job to be intolerable).

contributed to her constructive discharge.

(Pl.'s Opp. to Summ. J. at 18.)

Lynch's flippant remark, while rude, cannot be thought to have created intolerable working conditions. After plaintiff was displaced from her office due to renovations, Lynch suggested that she hold her meetings at the local beach. (Def.'s Mem. in Supp. of Summ. J. Ex. 4 at 80.) This type of remark could not cause a reasonable person to feel that they were "compelled" to resign because there was "no choice" to do otherwise.

Finally, the revocation of the full-time job offer cannot be considered intolerable. Plaintiff does not claim that the revocation itself was a perfected adverse employment action, but instead claims that it contributed to the intolerability of her job after her reinstatement. The court has been offered no legal authority to support the proposition that the revocation of a reassignment to full-time employment, which had never been implemented and to which the plaintiff herself had initially objected, could make continued part-time employment intolerable. Moreover, Overstreet has offered no evidence to suggest that she complained of this or any other work-related problem to Dr. Rogers after August 1996, despite his ruling in her favor.

In conclusion, because plaintiff has failed to set forth evidence that could convince a reasonable jury she was constructively discharged, her ADA claim fails.

A separate order follows.

### ORDER

For the reasons stated in the accompanying Memorandum, it is hereby Ordered that:

1. Defendant Board of Commissioners of Calvert County's motion for summary judgment is **GRANTED**;

2. defendants Calvert County Health Department and State of Maryland, Department of Health and Mental Hygiene's motion to dismiss is **GRANTED**;

3. copies of this Order and the accompanying Memorandum shall be mailed to counsel of record; and

4. the clerk of the court shall **CLOSE** this case.