Brian NICHOLS, Plaintiff,

v.

COMCAST CABLEVISION OF
MARYLAND, Defendant.

No. Civ.A. WMN–98–3091.

United States District Court,
D. Maryland.

Jan. 19, 2000.

186 F.3d 403 (3d Cir.1999). Nevertheless, the Court's procedure is in compliance with *Prosser.* Although the Court has taken a considerable length of time to resolve the motion, sanctions are imposed simultaneously with the resolution of the case on summary judgment. As noted in the discussion, the Court is not aware of any new occurrences of Attorney Rohn's sanctionable conduct, alleviating the Court of Appeals' concern that a delay may result in the party continuing to misbehave "because they do not have the benefit of disciplinary guidance from the court." *Id.* at 406. The dicta of the *Prosser* opinion concerning particularized notice and other due process concerns also are satisfied. Attorney Rohn had adequate notice of the Court's consideration of sanctions, first through Kmart's motion seeking sanctions, to which she responded, and then at the hearing. Attorney Rohn

was given and took advantage of the opportunity to be heard and was permitted to present witnesses, evidence, and argument on her own behalf. Rohn clearly was aware of the possible range of sanctions that the Court could impose. Her counsel argued in favor of an admonishment, while Attorney Rohn herself acknowledged the possibility of suspension or disbarment. (Hearing Tr. at 31, 36 (Oct. 28, 1997)) ("[Counsel for Kmart] asked that my license to practice law be suspended for 6 months if not revoked ....."). Kmart relied heavily on Local Rule 83.2 in support of its motion for sanctions and noted that it is in fact a privilege to be admitted to practice law before this Court. Attorney Rohn therefore has no grounds to complain that she was not aware of either the basis upon which the Court has imposed sanctions or the form those sanctions have taken.

Catherine Flynn of Mead & Flynn, P.A., Baltimore, MD, for Plaintiff.

Ari J. Kodeck, Ned S. Kodeck of Ned S. Kodeck, Chartered, Baltimore, MD, for Defendant.

## *MEMORANDUM OPINION*

GESNER, United States Magistrate Judge.

### I. *Introduction*

Plaintiff, Brian Nichols ("Nichols"), a former account executive employed by Comcast Cablevision of Maryland, L.P. ("Comcast"), brought this action against

Comcast for alleged violations of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* and 42 U.S.C. § 1981 and 1981a. Nichols alleges that Comcast managers discriminated against him on the basis of his sex by (1) failing to promote him from an account executive to a sales manager position; (2) unfavorably changing his sales territory and imposing unfair sales goals; and (3) sexually harassing him. Nichols further alleges that Comcast retaliated against him after he filed a charge of discrimination with the Equal Employment Opportunity.

The case has been referred to the undersigned for final disposition with the consent of the parties. 28 U.S.C. § 636(c); Local Rule 301.4. Now before the Court are Comcast's Motion for Summary Judgment (Paper No. 27), Plaintiff Nichols' Opposition (Paper No. 29), and Comcast's Reply (Paper No. 30). No hearing is deemed necessary. Local Rule 105.6. For the reasons stated below, Comcast's motion is granted.

## II. *Standard for Summary Judgment*

Summary judgment is appropriate when there exists no genuine issue as to any material fact and a decision may be rendered as a matter of law. Fed.R.Civ.P. 56(c); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The party moving for summary judgment has the burden to demonstrate the absence of any genuine issue of material fact. Fed.R.Civ.P. 56(c); *Pulliam Inv. Co. v. Cameo Properties,* 810 F.2d 1282, 1286 (4th Cir.1987).

If there clearly exist factual issues "that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party," then summary judgment is inappropriate. *Anderson,* 477 U.S. at 250, 106 S.Ct. 2505. The only facts that are properly considered "material" are those that might affect the outcome of the case under the governing law. *Id.* at 248, 106 S.Ct. 2505. If the evidence favoring the non-moving party is "merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249–250, 106 S.Ct. 2505. Thus, the existence of only a "scintilla of evidence," is not enough to defeat a motion for summary judgment. *Id.* at 252, 106 S.Ct. 2505.

To determine whether a genuine issue of material fact exists, all facts and all reasonable inferences drawn therefrom are construed in favor of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The nonmoving party, however, may not rest on its pleadings but must show that specific, material facts exist to create a genuine, triable issue. *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

On those issues on which the nonmoving party will have the burden of proof, it is his or her responsibility to oppose the motion for summary judgment with an affidavit or otherwise admissible evidence. *Id.;* Fed.R.Civ.P. 56(c); *Mitchell v. Data General Corp.,* 12 F.3d 1310, 1315–16 (4th Cir.1993) ("The summary judgment inquiry thus scrutinizes the plaintiff's case to determine whether the plaintiff has proffered sufficient proof, in the form of admissible evidence, that could carry the burden of proof in his claim at trial."). If a party fails to make a showing sufficient to establish the existence of an essential element on which that party will bear the burden of proof at trial, summary judgment is proper. *Celotex Corp.,* 477 U.S. at 322, 106 S.Ct. 2548.

While courts must be particularly careful when considering a motion for summary judgment in a discrimination case because motive is often the most important issue, summary judgment remains appropriate if the plaintiff cannot prevail as a matter of law. *Ballinger v. North Carolina Agric. Extension Serv.,* 815 F.2d 1001, 1005 (4th Cir.), *cert. denied,* 484 U.S. 897, 108 S.Ct. 232, 98 L.Ed.2d 191 (1987).

Therefore, if the record as a whole establishes that a jury reasonably could return a verdict for the plaintiff, then a genuine factual dispute exists and summary judgment is not appropriate. *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505.

## III. *Discussion*

### A. *Claim of Sex Discrimination by Failure to Promote*

#### 1. *Background*

Brian Nichols began working as an advertising account executive ("AE") at Comcast on October 6, 1994. (Paper No. 29 at 2). Prior to his employment with Comcast, Nichols had not worked in the direct media field of advertising. (Paper No. 27 at 4).[1] Although Nichols attended two community colleges, he did not obtain a degree from either school or from a four year college. (*Id.* at 4).

In July 1995, the position of local advertising sales manager previously occupied by Jim Cameron, a white male, became available. (Paper No. 29, Exh. A at 26). Nichols applied for the position and was interviewed by Michael Baptiste, an African American male ("Baptiste"), the Director of Advertising Sales. (Paper No. 29, Exh. A at 28). Baptiste testified that although Nichols lacked managerial and media experience, he considered Nichols qualified for the position and recommended that Nichols continue the application process by interviewing with the Vice President of Advertising Sales in Philadelphia. (*Id.* at 28–29). Nichols did not get the position. According to Comcast, he did not get the position because he needed additional managerial and media experience. According to Nichols, he did not get the job for undisclosed "political reasons."

(Paper No. 27 at 12). In any event, the position was filled by Wesley Sapp, a white male, who had over seven years of experience in cable television advertising and had a B.A. degree in telecommunications. (*Id.* at 19).

In 1996, the company created another local advertising sales manager position. Nichols testified that he applied again for the position through Baptiste (Paper No. 29, Exh. B at 14). Pat Barranger–Sweeney ("Barranger")[2], a white female, was chosen for the open position. (Paper No. 27, Exh. A–2 at 47). Prior to working for Comcast, Barranger was the sales marketing manager for WMAR–TV for twelve years and held a B.A. degree. (Paper No. 27, Exh. B at 13). According to Nichols, the decision to hire Barranger was made by Christine Rusk ("Rusk"), a white female who held the position of General Manager at Comcast and had known Barranger since 1985. (Paper No. 27, Exh. A–6 at 56–57).

Nichols applied a third time for the local sales manager position in 1997. (Paper No. 29, Exh. B at 18–19; Paper No. 27, Exh. B–16). He testified that he was notified by letter from the Human Resources department three to five months after the interview that he did not receive the job. (Paper No. 29, Exh. B at 19–20). The letter stated in pertinent part:

> [T]his also is to inform you that you were not selected for the vacant position of local Sales Manager.... No one has been selected to date. With respect to your application, it was determined that at this point in time, you do not have the requisite qualifications and experience for that position. Further, as noted in this memo and previously, your recent performance has diminished consider-

---

**1.** Previously, Nichols worked at a Holiday Inn as a food and beverage manager and at several car dealerships where he worked as a salesman and a sales manager. (Paper No. 27 at 4). He also worked as an account executive with Auto Trader Magazine and as a sales manager for a company where he sold copy

machines and related products to businesses. (*Id.* at 4–5).

**2.** Ms. Barranger's resume refers to her as Pat Barranger Sweeney although both parties refer to her as Pat Barranger. The Court will refer to her as Pat Barranger.

ably to the point where not only is your sales proficiency problematic, but also your adherence to Company policy, cooperation, and ability to work with management are indisputably now at a low point.

(Paper No. 27, Exh. B–15).

In January 1998, David George, a white male, was hired for the sales manager position. Mr. George had substantial experience in advertising in the television industry before being hired by Comcast and also held a B.A. degree. (Paper No. 27, Exh. B–19 at 14).

### 2. *Analysis*

A plaintiff in a Title VII case may prove a prima facie case of discrimination through either direct or circumstantial evidence, or under the burden shifting framework set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). The *McDonnell Douglas* test applies to sex discrimination claims, including Nichols' claim of reverse discrimination. *Lucas v. Dole,* 835 F.2d 532, 533–34 (4th Cir.1987) (reverse discrimination); *Causey v. Balog,* 929 F.Supp. 900, 909 (D.Md.1996), *aff'd,* 162 F.3d 795 (4th Cir.1998).

■ To establish a prima facie case of disparate treatment based on a failure to promote under *McDonnell Douglas,* a plaintiff must prove a set of facts enabling the Court to conclude that it is more likely than not that the employer's failure to promote the plaintiff was motivated by discrimination. *Evans v. Technologies Applications & Serv. Co.,* 80 F.3d 954, 959 (4th Cir.1996). Plaintiff must show by a preponderance of the evidence that (1) he is a member of a protected class; (2) his employer had an open position for which he applied or sought to apply; (3) he was qualified for the position; and (4) he was rejected for the position under circumstances giving rise to an inference of unlawful discrimination. *Id.* at 959–960. "The burden of establishing a prima facie case of disparate treatment is not onerous." *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).

If a plaintiff succeeds in proving a prima facie case, the employer has an opportunity to present a legitimate, non-discriminatory reason for its action. *Evans,* 80 F.3d at 959. If the employer does so, the presumption of unlawful discrimination created by the prima facie case " 'drops out of the picture' " and the burden shifts back to the employee to show that the given reason was just a pretext for discrimination. *Id.* (citing *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 511, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993)). The plaintiff always bears the ultimate burden of proving that the employer intentionally discriminated against him. *Texas Dep't of Community Affairs,* 450 U.S. at 253, 101 S.Ct. 1089.

For the reasons stated below, the Court concludes that Comcast is entitled to summary judgment on the "failure to promote" claim articulated by Nichols because he fails to establish a prima facie case of sex discrimination.[3] Even if the Court were to conclude that Nichols met his burden of

---

**3.** In addition to his primary claim of sex discrimination, Nichols' Amended Complaint vaguely and perfunctorily mentions race discrimination. Specifically, Nichols only mention of race, let alone racial discrimination, is: 1) that he was forced to resign due to his race (Paper No. 14 at 1); 2) that the director of the sales department was an African American male (*Id.* at ¶ 29); and 3) that he was sexually and racially discriminated against by treating him differently from the "female employees." (*Id.* at ¶ 33). Similarly, in Plaintiff's Opposition to Defendant's Motion for Summary Judgment, the only mention of racial discrimination is contained in one errant heading. (Paper No. 29 at 10). There has been absolutely no evidence offered by either party regarding racial discrimination; the entire focus of the summary judgment papers is on sex discrimination. Thus, the Court concludes that, to the extent plaintiff is actually advancing a claim of racial discrimination, it must fail as a matter of law. *Anderson,* 477 U.S. at 252, 106 S.Ct. 2505. The Court will analyze Nichols' claim of sex discrimination only.

establishing a prima facie case, Comcast has articulated legitimate, nondiscriminatory reasons for its failure to promote Nichols, which reasons Nichols cannot prove are pretextual so as to avoid summary judgment.

The first two elements of a prima facie case, that Nichols is a member of a protected class as a white male and that he applied for open positions [4] are clearly satisfied. As to the third element, that Nichols was qualified for the position, a review of the record establishes that Nichols did not possess the requisite qualifications for the position.

■ The position of advertising sales manager for which Nichols applied three times (1995, 1996 and 1997) required: 1) a college degree; 2) certain specialized training or the equivalent in work experience and self study; 3) three to five years of experience in advertising sales. In addition, the 1996 and 1997 position required a minimum of two years of media sales management. (Paper No. 27, Exh. B–17; Paper No. 33).[5] As Nichols acknowledged during his deposition, he did not have a college degree and had no prior advertising sales experience or media sales management when he joined Comcast.[6] (Paper No. 27, Exh. A–6 at 5–12). As a result, Nichols did not meet the minimum qualifications for the position.[7]

In an effort to establish that he indeed was qualified for the position, Nichols points to testimony by Baptiste concerning Nichol's application for the 1995 position. Specifically, Baptiste testified that he found Nichols qualified for the position and recommended that he be interviewed by the vice president of advertising sales. (Paper No. 29, Exh. A at 28–29). Baptiste further . testified, however, that Nichols needed to improve in areas such as gaining "managerial experience [and] media experience." (Paper No. 27, Exh. A–1 at 30). Baptiste's testimony, however, made clear that he was merely the first step in what was, at a minimum, a three step interview process with higher level managers, one of whom would make the ultimate hiring decision. (Paper No. 29, Exh. A at 29).

As noted above, the minimum requirements for the local sales manager job were clearly stated and were in writing. As a result, Baptiste's subjective belief that Nichols was qualified for the position, albeit with reservations, cannot alter the objective conclusion that Nichols did not meet the requisite written qualifications for the job. In conclusion, Nichols fails to meet the third element of a prima facie case of discrimination in that he was not qualified for the position for which he applied three times.

Indeed, each of the individuals selected for the three local advertising sales manager positions clearly met the minimum

---

4. While there appears to be some dispute regarding whether Nichols applied for the 1996 sales manager position ultimately awarded to Pat Barranger, for purposes of the pending motion, the Court must view the evidence in the light most favorable to Nichols and assume that he properly applied for that position.

5. The Job Posting which Comcast attached as an exhibit to its motion for summary judgment was for the 1996, or second, position for which Nichols applied. Therefore, by letter dated December 30, 1999, the Court requested supplemental information from the parties regarding the qualifications for the first (1995) and third (1997) positions for which Nichols applied. By letter dated January 4, 2000, Comcast provided the Court with the

job postings for the 1995 and 1997 positions. (Paper No. 33). Plaintiff has not filed any response to this submission and, therefore, does not appear to question that the job postings are admissible evidence. Consequently, the Court assumes, for purposes of this motion, that the job postings are admissible.

6. The requirement of two years media sales management applies only to the second and third positions Nichols applied for.

7. By the time Nichols applied for the 1997 position, he arguably had close to the required amount of experience in advertising sales. He still did not, however, have a college degree or the requisite experience in media sales management.

requirements for the job and indisputably were much more qualified than Nichols. Wesley Sapp, Pat Barranger, and David George each had a four year college degree and substantial experience, including management experience, in the media advertising field.[8]

■ Even if the Court were to conclude that Nichols was qualified for the position, Nichols fails to satisfy the fourth element of a prima facie case, that is, that he was rejected for the position under circumstances giving rise to an inference of unlawful discrimination. The selection of individuals who not only met the minimum requirements for the position but who, in fact, possessed superior qualifications does not give rise to an inference of unlawful discrimination.[9]

Perhaps even more compelling, however, is the fact that the first (1995) and third (1997)[10] local advertising sales manager positions were ultimately filled by white males, applicants of the same race and gender as Nichols. Given that a woman was not promoted over Nichols for either position, Nichols fails to meet the fourth prong of the *McDonnell Douglas* test. *See Etefia v. East Baltimore Community Corp.*, 2 F.Supp.2d 751, 764 (D.Md.1998) (male plaintiff failed to satisfy the fourth prong of the *McDonnell Douglas* promotion test in gender discrimination case where one of the promotions he sought was filled by a man and the other vacancy was frozen).

■ As to the second (1996) position which was given to Pat Barranger, a white female, as noted above, Barranger met the minimum qualifications for the position and was far more qualified than Nichols. Even if the Court were to conclude that Nichols met the four prong test of *McDonnell Douglas* with respect to this position, Comcast has offered legitimate, non-discriminatory reasons for promoting Barranger over Nichols. Comcast maintains that Barranger was chosen over Nichols because of her superior qualifications and experience.[11] (Paper No. 27 at 20). In-

---

8. The resumes of all three of the candidates ultimately selected for the 1995, 1996, and 1997 local sales manager positions reflect their superior qualifications. (Paper No. 27, Exhs. B–12, B–13, B–18).

9. In his opposition, Nichols points to deposition testimony of Paul Janowiak, an account executive at Comcast, who also filed a charge of discrimination and who apparently settled his dispute with Comcast. Specifically, he points to testimony that the women received more favorable accounts and that Mr. Janowiak applied for a sales manager position for which he had the support of the sales force but that Ms. Barranger got the position. (Paper No. 29 at 6–7). Nichols appears to argue that this is further evidence of unfair treatment of men by Comcast. In the Court's view, the opinion testimony of Mr. Janowiak does not create a genuine question of material fact so as to defeat Comcast's motion for summary judgment. Further, it is doubtful that it would be admissible into evidence. Fed.R.Evid. 701.

10. The fact that there was a delay between Nichols' rejection for the 1997 position and the filling of the position with David George is of no consequence since the opening was for a managerial position. In cases involving un-

skilled position, a refusal to hire a qualified applicant while the opening remains unfilled creates an inference that considerations other than merit are influencing the selection process. *Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978). As in this case, however, where the opening involves a managerial position for which there are several applicants, the fact that an employer turns down a minimally qualified applicant in the hope that a better qualified applicant will appear, no inference of discrimination is created. *Mason v. Continental Illinois National Bank*, 704 F.2d 361, 365 (7th Cir.1983). Here, however, Nichols did not meet the minimum qualifications.

11. While the record clearly establishes that all three of the applicants chosen over Nichols possessed superior qualifications, Comcast has proffered several other reasons for not hiring Nichols for the third (1997) position. Among the reasons were his diminished sales performance, his lack of adherence to company policy and knowledge of equal employment policy, his difficulty working with management, and his questionable business ethics. (Paper No. 27 at 14, 20, Exhs. B–15, B–25). Even if the Court were to find that Nichols established a prima facie case

deed, Barranger had a B.A. degree and was a sales marketing manager for WMAR–TV for twelve years.

■ "Job performance and relative employee qualifications are widely recognized as valid, non-discriminatory bases for any adverse employment decision." *Evans*, 80 F.3d at 960. It is further accepted that "the employer has discretion to choose among equally qualified candidates provided the decision is not based upon unlawful criteria." *Id.; see also Carter v. Ball*, 33 F.3d 450, 458 (4th Cir.1994) (showing that one applicant is better qualified than the plaintiff effectively rebuts prima facie case). Under these circumstances, a plaintiff must present proof that the employer's explanation is pretextual and that he was the victim of intentional discrimination, the so-called "pretext-plus" requirement. *Evans*, 80 F.3d at 960; *see Vaughan v. Metrahealth Companies, Inc.*, 145 F.3d 197, 202 (4th Cir.1998) (explaining "pretext-plus" requirement). In a failure to promote case, the plaintiff must establish that he was the better qualified candidate for the position sought. *Evans*, 80 F.3d at 960.

Nichols has not established that Comcast's reasons are pretextual or that he was better qualified for the position. The only argument offered by Nichols to rebut Comcast's reasons for not promoting Nichols is that the Court should consider the motive of two of Comcast's managers, Barranger and Baptiste, and the "conflicting testimony as to the reasons for the treatment of the Plaintiff." (Paper No. 29 at 13). Unfortunately, Nichols does not detail any such "conflicting testimony." Without more to establish that the real reason for Comcast's failure to promote him was unlawful discrimination, Nichols falls far short of the requirement that he produce evidence sufficient to overcome summary judgment.

This is particularly true where, as here, plaintiff has not offered anything other than his bald allegations. *See id.* (employee's unsubstantiated allegations and bald assertions concerning her own qualifications and shortcomings of co-workers fail to disprove employer's explanation or show discrimination); *Williams v. Cerberonics, Inc.*, 871 F.2d 452, 456 (4th Cir.1989) (plaintiff's own assertions of discrimination insufficient to counter substantial evidence of legitimate, non-discriminatory reasons for adverse employment action).

In sum, Nichols has failed to establish a prima facie case of discrimination. Even assuming that Nichols satisfied *McDonnell Douglas'* four part test, Comcast has proffered legitimate, non-discriminatory reasons for its conduct which remain unrebutted. Accordingly, Comcast is entitled to summary judgment on this claim.

### B. *Claim of Sex Discrimination By Territory Reassignment and Budget Increase*

#### 1. *Background*

When Nichols was hired by Comcast in 1994, he was assigned a sales territory which included Hunt Valley, Cockeysville, Timonium, and Lutherville. (Paper No. 29, Exh. B at 78, 80). Nichols was given a sales target (hereinafter referred to as what the parties call a "budget") to attain within that territory. He earned commissions in accordance with the existing compensation package for AEs. (Paper No. 27, Exh. B–1).

Under the terms of the package, the percentage of Nichols' commission on sales would increase once he reached the budget for his territory, thus a lower budget would lead to earning higher commissions more quickly. (Paper No. 27, Exh. A–6 at 28–30). The terms of this compensation package remained unchanged for 1994, 1995, and 1996. Comcast increased Nich-

---

for the third position, the Court concludes that the reasons articulated by Comcast are legitimate, nondiscriminatory reasons for not

promoting Nichols. Nichols has not offered any evidence establishing that these reasons are pretextual.

ols' budget, as well as the budgets of many other employees, annually. (Paper No. 27, Exh. B–9).[12]

Nichols worked his assigned territory and also successfully developed business in the Inner Harbor and Little Italy areas of Baltimore City which, until mid–1996, were areas in which any AE could develop business. (Paper No. 29, Exh. E at 56; Paper No. 27, Exh. A–6 at 81). In mid–1996 Comcast changed the territory structure. Barranger and Rusk, both white female managers, accomplished the reassignment of territories and Baptiste, a black male manager, oversaw their work. (Paper No. 29, Exh. E at 48). According to Barranger, the motivation behind the reassignment of the territories was to get "more money out of Baltimore City," to develop business in Anne Arundel County, and to relieve AE overcrowding in some areas and deficits in others. (Paper No. 27, Exh. A–2 at 51–52).

As a result of the changes, Nichols was assigned a new territory consisting of the west side of Baltimore City[13] and the Lutherville portion of his old territory. (Paper No. 29, Exh. E at 53). The remainder of Nichols' originally assigned territory was reassigned to a white male named Steve Polek. (Paper No. 27, Exh. A–6 at 104–105). The Inner Harbor and Little Italy territory which was part of the "free" area previously developed by Nichols was no longer "free" territory as it was included in the east side territory, which was assigned to Colleen Thorner, a white female. (Paper No. 29, Exh. E at 48, 53).

Barranger testified that Nichols was assigned the west Baltimore City territory because he had successfully sold copiers there in a past job. (*Id.* at 57). Nichols disliked his new territory because he considered it far less lucrative than his old one. At least one AE agreed that this was an extremely difficult territory in which to develop business for Comcast (Paper No. 29, Exh. D at 35, 41). As to the reassignment of territories in general, numerous AEs, both male and female, testified that the process was unfair and that management favored certain AEs, both male and female.[14]

Nichols' budget for the new territory was increased to $469,324. (Paper No. 27, Exh. B–8). According to Barranger, this budget increase was based on factors including (1) the "past business plus percent increases that [management] was looking for," (2) the benefit to Nichols of his existing on-air accounts which were grandfathered to him, and (3) the expectation that he would develop "additional dollars out of the west side." (Paper No. 27, Exh. A–2 at 57). Of the five other AEs supervised by Barranger, two white males were given lower budgets in 1997 than in 1996; one other white male in addition to Nichols was given a higher budget in 1997; and two women were given higher budgets in 1997 than in 1996. (Paper No. 27, Exh. B–

---

**12.** In 1994, his annualized budget was $149,000; in 1995, it was $274,000; in 1996, it was $350,000; and in 1997, it was $476,000 (Paper No. 29 at 3; Paper No. 27, Exhs. B–8, B–9). In 1995, Nichols earned "$60,000 plus," and in 1996, he earned $94,000. (Paper No. 27, Exh. A–6 at 30–31).

**13.** The west side of Baltimore City was defined by designating Charles Street as the east-west dividing line. (Paper No. 29, Exh. E at 48).

**14.** According to the testimony of many AEs, some AEs were given favorable treatment. Steve Nawrozki testified that those favorites included Joni LeSage, Colleen Thoner, Bob Morgan, and Laurie Travisano. (Paper No. 29, Exh. F at 38). Nawrozki also testified that management seemed to treat women better than men. (*Id.* at 20, 28). Michelle Sherman testified that favoritism was rampant at Comcast. (Paper No. 29, Exh. G at 7). Bonnie O'Brien testified that Pat Barranger played favorites (Paper No. 29, Exh. C at 17). Sandy Remley testified that the favorites included Colleen Thoner, Bob Morgan, and Steve Polek. (Paper No. 29, Exh. D at 11). Paul Janowiak testified that Christine Rusk had a circle of friends including "Colleen Thoner ..., Bob Morgan, Joni LeSage.... Steve McKee ... [and] Rick Kozek." (Paper No. 27, Exh. A–4 at 44).

8). A white female received the highest 1997 budget of all. (*Id.*).

In 1997, Comcast instituted a new compensation plan for all AEs. (Paper No. 27, Exh. A–6 at 32–33). The plan increased the AE base salary and changed the commission structure. (Paper No. 27, Exh. B–2). A white female AE testified that the new compensation structure made it harder to obtain the highest bracket on the commission scale. (Paper No. 27, Exh. A–7 at 9). Several AEs testified that they disliked the new compensation plan and memorialized their dissatisfaction in a memorandum to management. (Paper No. 27, Exh. B–3). In response, Comcast gave the five highest performing AEs, three men including Nichols and two women, a one-time $50,000 reduction in their 1997 budgets. (Paper No. 27, Exh. A–2 at 65; Exhs. B–4, B–5, B–6).

## 2. *Analysis*

Nichols contends that Comcast treated him differently than similarly situated female employees when it reassigned him to a less profitable sales territory in 1996 and required him to meet an unreasonably high sales budget.[15] (Paper No. 14 at ¶¶ 16, 17). Comcast asserts that Nichols

has failed to prove a prima facie case of discrimination regarding territory assignment and budget increase. (Paper No. 27 at 22). For the following reasons, Comcast is entitled to summary judgment on these claims.

■ To establish a prima facie case of discrimination based on an adverse employment action,[16] a plaintiff must prove that: (1) plaintiff is a member of a class protected by the statute; (2) plaintiff suffered an adverse employment action; (3) at the time, the plaintiff was qualified for the position; and (4) the plaintiff was treated less favorably than others not in the protected class. *Sanchez v. Denver Public Schools*, 164 F.3d 527, 531 (10th Cir.1998) (applying factors to claim of age and sex discrimination based on transfer of a teacher to another school); *cf. Rankin v. Greater Media, Inc.*, 28 F.Supp.2d 331, 336 (D.Md.1997) (applying similar factors in a demotion case).

■ As in the failure to promote context discussed above, once the plaintiff establishes a prima facie case, the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for the action. *Sanchez*, 164 F.3d at 531; *see also Ran-*

**15.** Nichols also claims that he was denied training opportunities (Paper No. 27, Exh. B–36) and had accounts taken away from him in violation of Title VII (Paper No. 29 at 11) but offers no evidence in support of these claims. With respect to training opportunities, Comcast points to testimony from several AEs, both males and females who worked at Comcast during Nichols' tenure, that training opportunities were frequent and often of high quality. (Paper No. 27, Exhs. A–3 at 25, A–4 at 8, A–5 at 23–24). Further, Comcast has produced numerous memoranda announcing training opportunities to AEs. (Paper No. 27, Exhs. B–19, B–20, B–21, B–22). Comcast also cites to testimony by Nichols that he attended Cablescan and Claritas training. (Paper No. 27, Exh. A–6 at 42–43).

Nichols' allegation that accounts were taken from him apparently stems, in part, from Comcast's policy of designating franchise businesses and car dealerships as regional accounts not open to the sales efforts of account executives. Though he obviously dis-

liked this policy, Nichols himself testified that it was applied "across-the-board to everyone." (Paper No. 27, Exh. A–6 at 80–81).

Because of the complete lack of evidence on these two allegations, Comcast is entitled to summary judgment on these claims.

**16.** Neither Nichols nor Comcast have provided the Court with an analytical framework within which to analyze these allegations of disparate treatment. While the Court's own research has not yielded any case law specifically tailored to the facts of this particular claim, the Court recognizes that the *McDonnell Douglas* framework should not be applied in a "rigid, mechanized, or ritualistic manner" but rather should serve as a means to focus the presentation of proof. *Halperin v. Abacus Technology Corp.*, 128 F.3d 191, 196 n. 6 (4th Cir.1997). Accordingly, the Court will apply the basic test for proving a prima facie case of adverse employment action to the present allegations of territory reassignment and budget increase.

*kin,* 28 F.Supp.2d at 336. If the Defendant does so, then the plaintiff must show that the employer's stated reasons are pretextual and, in this Circuit, that the real reason for the adverse action was impermissible discrimination, the "pretext-plus" requirement. *Sanchez,* 164 F.3d at 531; *Vaughan,* 145 F.3d at 202.

Nichols satisfies the first element of a prima facie case in that he is a member of a protected class. Nichols also meets the third element, that he was qualified for the position, that is, marketing in any territory, because the Court accepts as true for purposes of this motion that during the majority of his tenure at Comcast, Nichols was one of the highest performing AEs.

 To prove the second element of a prima facie case, that he suffered an adverse employment action, Nichols must establish more than a "mere inconvenience or an alteration of job responsibilities." *Crady v. Liberty Nat'l Bank & Trust Co.,* 993 F.2d 132, 136 (7th Cir.1993). Employer conduct amounts to an adverse employment action if it "constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Burlington Industries, Inc. v. Ellerth,* 524 U.S. 742, 761, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998).

 A purely lateral transfer does not constitute an adverse employment action. *Sanchez,* 164 F.3d at 532. A transfer of an employee which has the direct effect of reducing his or her sales and hence their commissions may, depending upon the facts, constitute an adverse employment action. *Compare Williams v. Bristol–Myers Squibb Co.,* 85 F.3d 270, 274 (7th Cir.1996) (indirect and minor effect on commission income is not sufficient to transform lateral transfer into a demotion) *with Goss v. Exxon Office Systems Co.,*

747 F.2d 885, 888 (3rd Cir.1984) (saleswoman shifted to an inferior territory coupled with other indicia of discrimination was constructively discharged where compensation was based mostly on commissions and she suffered substantial cut in pay).

While Nichols was given a new territory which he maintains was less profitable than his old territory, the evidence before the Court does not indicate whether he suffered a cut in pay or any other reduction of benefits as a result of the new assignment. In 1995, Nichols earned $65,-000. The territory was changed in mid–1996 and, in 1996, Nichols earned $94,000. Thus, without further explanation which Nichols has not offered, it appears that he earned more in 1996 notwithstanding the reassignment.[17] There is no evidence that the reassignment and budget increase, while they might have made his job more difficult, constituted an adverse employment action. *See Williams,* 85 F.3d at 274 (transfer involving no reduction in pay and no more than a minor change in working conditions not an adverse action).

 Even assuming that the territory reassignment and budget increase constitute adverse employment actions, plaintiff has not established the fourth element of a prima facie case. There is no evidence that Nichols was treated less favorably than others not in the protected class, that is, women. Nichols provides evidence that the decisions of which he complains were made by female managers (although approved by a male general manager) and that Nichols received a territory, the west side of Baltimore City, which was generally regarded as one of the least favorable. Further, Nichols proffers that the east side of Baltimore City territory, where he had established contacts while it was still an open territory, was assigned to a female. On the other hand, Nichols concedes that his lucrative former territory

---

**17.** Nichols went on sick leave beginning in August 1997 and there is no evidence in the record regarding whether his earnings for the portion of 1997 during which he worked were more or less than he made for a similar period of time in previous years.

was reassigned to a white male. The evidence also shows that, although Nichols' 1997 budget was raised from 1996, his female supervisor lowered the 1997 budgets of two men and raised those of two women as compared to their 1996 budgets. A woman had the highest budget for 1997. And after the initial budgets were set, Comcast gave three men, including Nichols, and two women a one time $50,000 reduction in their 1997 budget.

While there is evidence from other AEs that the territory assignments and budget increases were unfairly administered, these same AEs overwhelmingly labeled the unfair treatment as favoritism rather than discrimination. Both men and women testified that certain men and women received favorable treatment to the detriment of others. While this evidence may establish questionable and unfair practices at Comcast, the fact that both men and women were among the beneficiaries and victims of this practice shows that a conclusion of sex discrimination cannot be supported. Even viewing the evidence in the light most favorable to the plaintiff, it establishes, at the absolute worst, that there was favoritism.

Favoritism, while unfair, is not violative of Title VII in the absence of improper discriminatory intent. *Holder v. Raleigh,* 867 F.2d 823, 825–826 (4th Cir.1989). The list of impermissible employment considerations does not include favoritism and courts are not "free to add [their] own considerations to the list." *Id.* at 826. Given the fact that both the male and female employees were given, and were unhappy with, the new territories and budgets, the Court has no evidence from which it can conclude that Nichols was treated less favorably than the women at Comcast.

Nichols relies heavily on the testimony of Steven Nawrozki, a white male account executive, to establish that women were treated better than men. Mr. Nawrozki acknowledged that he was "not sure why they were given the favorable treatment.

They were just given it." (Paper No. 29, Exh. F at 12). But when specifically asked if people were given favorable treatment based on race, religion or gender, he acknowledged that he didn't know why people were given favorable treatment. (*Id.* at 12–13, 15, 27). Mr. Nawrozki's testimony, even if treated as admissible, does not chance the Court's view of the evidence because the essence of his testimony is merely that there was favoritism at Comcast. Even if Mr. Nawrozki's testimony is construed to state his personal opinion, of doubtful admissibility, that women were given favorable treatment, it does not create a genuine issue of material fact in light of the circumstances surrounding the territory reassignments and budget increases as described above. As such, his testimony does not preclude the granting of summary judgment for Comcast on this claim.

■ Furthermore, even assuming that Nichols established a prima facie case, Comcast proffered legitimate, non-discriminatory reasons for the territory reassignment and budget increase. First, Nichols' reassignment was merely a part of a global change in territory structure by Comcast which affected numerous salespersons, both men and women, and was done for business reasons, that is, to maximize marketing efforts. Accordingly to Ms. Barranger, she assigned Nichols the west side of Baltimore City territory because he had previous experience selling copiers in the area, a fact which he evidently does not dispute. As to Nichols' budget increase, Ms. Barranger testified that the precise amount of the increase was based on a combination of factors including the amount of money Comcast hoped to generate out of the territory, his past sales success, and existing accounts which were grandfathered to him. Nichols has offered no evidence that these reasons are pretextual. Accordingly, summary judgment for Comcast on these claims is appropriate.

### C. *Claim of Sexual Harassment*

#### 1. *Background*

In Nichols' Amended Complaint, he alleges that Comcast sexually discriminated against him by harassing him and creating a hostile work environment. (Paper No. 14 at ¶¶ 32–33). Comcast argues that any claim by Nichols of sexual harassment must fail as a matter of law because Nichols failed to exhaust all administrative remedies on this claim prior to filing suit. (Paper No. 27 at 27–28).

#### 2. *Analysis*

In order to assert a Title VII claim in federal court, a plaintiff must have exhausted his administrative remedies with respect to the claim. *Taylor v. Virginia Union Univ.*, 193 F.3d 219, 239 (4th Cir.1999), *cert. denied,* — U.S. —, 120 S.Ct. 1243, — L.Ed.2d — (2000). Courts may only exercise jurisdiction over claims encompassed within the administrative charge and claims "like or related to allegations contained in the charge, or which grow out of such allegations." *Nealon v. Stone*, 958 F.2d 584, 590 (4th Cir.1992).

There is no mention of a hostile work environment or sexual harassment of any kind in the EEOC charge of discrimination filed by Nichols. In the charge, Nichols alleges only that "[w]hite males have been systematically discriminated against continuously from the time of the charging party's hire to the present in terms of job assignments, job training, pay promotions and terminations." (Paper No. 27, Exh. B–36). Consequently, the hostile work environment and sexual harassment allegations were not presented to the EEOC and this Court has no jurisdiction over them. It also merits mention that Nichols has not offered any evidence regarding these claims in his opposition to Comcast's motion for summary judgment. Accordingly, summary judgment for Comcast as to these allegations is warranted. *See Riley v. Technical and Management Services Corp., Inc.*, 872 F.Supp. 1454, 1459 (D.Md.1995), *aff'd*, 79 F.3d 1141 (4th Cir.1996) (unpublished table decision) (summary judgment for employer because there is no mention of a hostile work environment or sexual harassment of any kind in the EEOC charges).[18]

### D. *Claim of Retaliation*

#### 1. *Background*

Nichols filed a charge of discrimination with the EEOC on May 29, 1997. (Paper No. 27, Exh. B–36). Nichols maintains that after he filed the charge, Christine Rusk began monitoring his whereabouts by making him fill out paperwork. (Paper No. 29, Exh. B at 52–53). He also testified that, "[a]fter I filed ... they forc[ed] me into, I will use the word bogus training programs for my boss to start arguments with me." (*Id.*, Exh. B at 55). By memo dated July 28, 1997, Nichols was invited to participate in a Performance Improvement Program which was designed to help AEs with lagging sales. (Paper No. 27, Exh. B–29).

---

**18.** Even if the Court had jurisdiction over the sexual harassment claim, Nichols fails to prove a prima facie case under *Faragher v. City of Boca Raton*, 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998). In order to establish a hostile work environment, a plaintiff must prove that a sexually objectionable environment existed which was "both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." *Id.* at 787, 118 S.Ct. 2275 (quoting *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21–22, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)). To determine whether an environment is hostile or abusive, the Court should look at all the circumstances, including the frequency and severity of the conduct; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. *Id.* at 787–88, 118 S.Ct. 2275. Nichols' Opposition is completely devoid of any discussion or proof of any sexual harassment or that a sexually hostile environment existed at Comcast.

On August 11, 1997, Nichols, who believed he was having a heart attack, began a ninety day leave of absence on the advice of his doctor. (Paper No. 29, Exh. B at 21–22). Nichols collected disability benefits under a policy sponsored by Comcast for the duration of his leave. (*Id.* at 22).

On October 8, 1997, Michael Baptiste, the Regional Director of Advertising, sent Nichols a note advising him that his supervisor would handle his clients until his return and instructing him to refrain from working until he had been given the appropriate medical clearance since he had been put on disability because his doctor had said he should not be working. (Paper No. 27, Exh. B–23).

Both during and after his leave of absence, Nichols contacted Stephen Burch, Senior Regional Vice President of Comcast, to request meetings to discuss what he believed were the unfair and discriminatory treatment practices Nichols observed at Comcast. Burch twice refused to meet with Nichols. (Paper No. 29 at 8, Exh. I at 20). On November 17, 1997, Nichols returned to work (Paper No. 29 at 8) and immediately tendered his resignation. (Paper No. 27, Exh. B–24). Relying on the above facts, Nichols Amended Complaint includes a count of retaliation for his filing of a charge of discrimination with the EEOC.[19]

### 2. *Analysis*

▮ In order to establish a prima facie claim of retaliation in violation of Title VII, 42 U.S.C. § 2000e–3(a),[20] a plaintiff must show that "1) the employee engaged in protected activity; 2) the employer took adverse employment action against the employee; and 3) a causal connection existed between the protected activity and the adverse action." *Ross v. Communications Satellite Corp.*, 759 F.2d 355, 365 (4th Cir.1985). The employer may then rebut the prima facie case by showing that there was a legitimate, non-discriminatory reason for the adverse action. *Id.* (citing, *Womack v. Munson*, 619 F.2d 1292, 1296 (8th Cir.1980)). The employer need not prove the absence of a retaliatory motive; the employer need only raise a genuine issue of fact as to whether retaliation for the protected activity occurred. *Id.*

▮ If the employer produces a legitimate nondiscriminatory explanation, the employee bears the ultimate burden of proving retaliation by demonstrating that the employer's proffered reason is pretextual. *Id.* At that point, the plaintiff must demonstrate that engaging in the protected activity was the "motivating part" in the employer's adverse action against the plaintiff. *McNairn v. Sullivan*, 929 F.2d 974, 980 (4th Cir.1991) (citing *Price Waterhouse v. Hopkins*, 490 U.S. 228, 244, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989)).

[20] Here, the first element of a prima facie case of retaliation is clearly met by proof that Nichols filed a charge of discrimination with the EEOC on May 29, 1997. (Paper No. 27 at 25). As to the second element, Nichols claims that the following action by Comcast constituted adverse employment action: (1) requiring him to attend its Performance Improvement Program; (2) increasing its criticism of him even though he was performing all his job requirements; and (3) refusing to meet with him to discuss his treatment.[21]

---

**19.** Although Count II of his Amended Complaint alleges "retaliatory discharge," Nichols has not elsewhere mentioned any claim that he was discharged in retaliation for filing his EEOC claim. (Paper No. 14 at Count II). Rather, his focus is on "adverse" action taken against him by Comcast.

**20.** "It shall be a unlawful employment practice for an employer to discriminate against any of his employees … because he has op-

posed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e–3(a).

**21.** Nichols has alleged other instances of retaliation (Paper No. 29 at 11), all of which occurred long before Nichols filed either his discrimination complaint with Comcast in

(Paper No. 29 at 13–14). For the following reasons, the Court concludes that, even assuming Comcast took the actions alleged by Nichols, they do not amount to adverse employment action.

It is undisputed that Nichols was asked to participate in Comcast's Performance Improvement Program at some point after he filed his charge of discrimination with the EEOC. (Paper No. 30 at 7). The Court does not find, however, that participation in this program, whether optional (as Comcast maintains) or obligatory (as Nichols suggests), constitutes adverse employment action as a matter of law. While Nichols' subjective belief was that he did not need the Performance Improvement Program, there is absolutely no evidence that attendance in the program adversely affected the terms, benefits, or conditions of his employment which is necessary to establish an adverse employment action. *See Munday v. Waste Management of North America, Inc.,* 126 F.3d 239, 243 (4th Cir.1997), *cert. denied,* 522 U.S. 1116, 118 S.Ct. 1053, 140 L.Ed.2d 116 (1998) (defendant's conduct did not rise to the level of an adverse employment action where there was no evidence that the terms, conditions, or benefits of the employee's employment were adversely affected).

 As to Nichols' allegation that he was subjected to unfair criticism by management[22], the claim must fail because, even if he was subject to some criticism after the EEOC charge, he has not shown that the criticism rose to the level of an adverse employment action. And Nichols certainly has not established facts constituting a constructive discharge.[23] *Cf. Munday,* 126 F.3d at 243–44 (difficult or unpleasant working conditions such as being ignored by supervisor and co-workers are not so intolerable as to compel a reasonable person to resign); *Bristow v. Daily Press, Inc.,* 770 F.2d 1251, 1255 (4th Cir.1985) (employee not guaranteed a work environment free of stress).

Similarly, Nichols' third claim of retaliation, that Comcast refused to meet with him to discuss his treatment must also fail

---

March 1997 or his charge of discrimination with the EEOC in May 1997. As such, they cannot as a matter of law form the basis for a retaliation claim. *See Beall v. Abbott Laboratories,* 130 F.3d 614, 619 (4th Cir.1997) (adverse employment action must be causally linked to the employee's protected action).

**22.** Nichols testified that Christine Rusk was "manipulating the system" by requiring him to fill out a lot of paperwork. (Paper No. 29, Exh. B at 52–53).

**23.** It is unclear whether Nichols even asserts a claim of retaliation on a constructive discharge theory. The Amended Complaint makes reference to retaliatory discharge in a heading (Paper No. 14 at ¶¶ 37–40), yet Nichols' Opposition does not mention constructive discharge in its retaliation discussion. (Paper No. 29 at 13–14).

Constructive discharge occurs "when 'an employer deliberately makes an employee's working conditions intolerable and thereby forces him to quit his job.' " *Holsey v. Armour & Co.,* 743 F.2d 199, 209 (4th Cir.1984), *cert. denied,* 470 U.S. 1028, 105 S.Ct. 1395, 84 L.Ed.2d 784 (1985) (quoting *J.P. Stevens & Co. v. NLRB,* 461 U.S. 490, 494 (4th Cir.

1972)). A plaintiff alleging constructive discharge must prove two elements: deliberateness of the employer's action, and intolerability of the working conditions. *Bristow v. Daily Press, Inc.,* 770 F.2d 1251, 1255 (4th Cir. 1985).

"Intolerability of working conditions ... is assessed by the objective standard of whether a 'reasonable person' in the employee's position would have felt compelled to resign.... An employee is protected from a calculated effort to pressure him into resignation through the imposition of unreasonably harsh conditions, in excess of those faced by his co-workers. He is not, however, guaranteed a working environment free of stress." *Bristow,* 770 F.2d at 1255.

None of the facts offered by Nichols rise to the level of objective intolerability sufficient to prove adverse employment action through constructive discharge. *See Rankin,* 28 F.Supp.2d at 342 (no constructive discharge where record reveals nothing more than typical inter-office disputes, such as mild reprimands and performance expectations and evaluations about which the employee and employer disagree).

as a matter of law. Even accepting these facts as true,[24] Nichols cannot establish that they constituted an adverse employment action. A mere inconvenience without a significant change in employment status is insufficient. *See* *Sanchez*, 164 F.3d 527, 532 (10th Cir.1998). Again, nor do the facts alleged by Nichols constitute such intolerable conditions so as to give rise to a finding of constructive discharge. *See Holsey v. Armour & Co.*, 743 F.2d 199, 209 (4th Cir.1984), *cert. denied*, 470 U.S. 1028, 105 S.Ct. 1395, 84 L.Ed.2d 784 (1985).

 Nichols has also failed to offer evidence sufficient to establish the third element of a prima facie case, that there is a causal connection between the filing of his complaint and the "adverse action" of which he complains. The only evidence he has offered was that these actions occurred after he filed his EEOC complaint; that evidence is insufficient by itself to establish a causal connection. *See Gibson v. Old Town Trolley Tours*, 160 F.3d 177, 182 (4th Cir.1998) (employer's knowledge of filing of complaint is necessary, but not sufficient by itself, to establish causation for retaliation claim).

 Moreover, even if Nichols established a prima facie case, Comcast has met its burden to show legitimate, non-retaliatory reasons for its actions. Comcast produced evidence that Nichols was asked to participate in the Performance Improvement Program because he had not met his budgeted targets for several months and that others were also asked to participate on the same basis. (Paper No. 27, Exhs. B–15, B–29, B–32). In response to the allegation of increased criticism, Comcast showed that management twice reprimanded Nichols for insubordination towards his supervisors pursuant to its Progressive Discipline Handbook for specific conduct unrelated to the filing of Nichols' complaint.[25] (Paper No. 27 at 26, Exh. B–33).[26]

Nichols has not shown these reasons to be pretextual. Accordingly, Comcast is entitled to summary judgment on the retaliation claim.

## IV. *Conclusion*

For the foregoing reasons, defendant Comcast's motion for summary judgment is granted. A separate order shall be issued.

## *ORDER*

For the foregoing reasons, IT IS this 19th day of January, 2000 ORDERED that:

1. Defendant's Motion for Summary Judgment be, and the same hereby is, *Granted*;

2. The Clerk of the Court shall mail a copy of this Order with the accompanying

---

24. Comcast, of course, disputes that they refused to meet with Nichols. It maintains that Michael Baptiste, the Director of Advertising Sales, and Pat Barranger, Nichols' immediate supervisor, responded to Nichols' request for a meeting by scheduling and then rescheduling, at Nichols' request, a meeting with him in June 1997.

25. Barranger testified that she issued Nichols a verbal warning for disobeying her request that he stop talking to a co-worker at a cubicle and join the Cable Scan training session already in progress. (Paper No. 27, Exh. A–2 at 80–81). On September 19, 1997, Nichols was issued another warning telling him to refrain from making racist and sexist comments about his supervisors. (Paper No. 27, Exh. B–35). Nichols conceded during his deposition that he may have made such comments in conversations with sympathetic colleagues. (Paper No. 27, Exh. A–6 at 57–58).

26. With respect to Nichols' claim that management would not meet with him, as noted above, Nichols clearly has not established a prima facie case. Even if this action constituted an adverse employment action, "[i]t is not discrimination for an entity to attempt to control its liability" by not discussing matters subject to pending claims and "when confronted with the possibility of ... litigation." *Gibson*, 160 F.3d at 181.

Memorandum Opinion to counsel of record; and

3. This case be CLOSED.