**Susan LAPRISE, Plaintiff,**

v.

**ARROW INTERNATIONAL, INC., Defendant.**

**No. 1:00CV1152.**

United States District Court, M.D. North Carolina.

Dec. 5, 2001.

Nancy Pulliam Quinn, The Quinn Law Firm, Greensboro, NC, for Plaintiff.

Lucretia D. Guia, Patti West Ramseur, Haynsworth Baldwin Johnson & Greaves, LLC, Greensboro, NC, for Defendant.

## MEMORANDUM OPINION

OSTEEN, District Judge.

Plaintiff Susan Laprise (Laprise) filed this action against Defendant Arrow International, Inc. (Arrow) alleging that Arrow discriminated against her and constructively discharged her because of her race and her age, in violation of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e, *et. seq.*

and the Age Discrimination and Employment Act of 1967 (ADEA), 29 U.S.C. § 621, *et. seq.* This matter is now before the court on Defendant's Motion for Summary Judgment.

For the reasons stated herein, Defendant's Motion for Summary Judgment will be granted.

## I. FACTUAL BACKGROUND

The facts, stated in the light most favorable to the Plaintiff, are as follows.

Defendant manufactures and packages medical supplies. On August 4, 1997, Defendant hired Plaintiff, a 44–year–old white female, as a kit assembler at its Asheboro, North Carolina, facility. Plaintiff reported directly to Teresa Jones (Jones), a 50–year–old black female. Jones reported to the department manager, Daryl Mosby (Mosby), a 40–year–old black male.

Plaintiff worked as a kit assembler until January 1999 when she applied for a transfer to the position of packer. Defendant awarded Plaintiff the packer position over two other employees. Because Defendant had five packers, Defendant allowed Plaintiff to work primarily as a "roving packer" where she could move around the plant rather than be assigned to a certain station.[1] Plaintiff preferred roving over being assigned to a specific room. (Pl.'s Dep. at 137.)[2] Upon Plaintiff's request, Defendant allowed Plaintiff to continue reporting directly to Jones instead of reporting to Nancy Morgan (Morgan). (Pl.'s Dep. at 108.) Kit assemblers, packers,

---

1. Defendant often assigns an employee to "rove." Although this is not an actual position with a written job description, the "roving packer" generally fills in when a packer is absent from work, assists the other packers with labeling or packing, and makes sure each packer has the necessary supplies. (Wilson Dec. ¶ 4.) (Alice Wilson's Declaration is an attachment to Defendant's Motion for Summary Judgment.)

2. Plaintiff's Deposition is an attachment to Memorandum in Support of Defendant's Motion for Summary Judgment.

and roving packers have the same rate of pay and benefits.

Plaintiff worked for Defendant without incident until January 2000. In mid-January, Plaintiff met with Alice Wilson (Wilson), the human resources manager, and informed her that she believed three of her coworkers were trying to get her into trouble by sabotaging her work. (Pl.'s Dep. at 54; Wilson Dec. ¶ 7.) Plaintiff did not identify the coworkers or specific incidents but merely stated that she wanted Wilson to be aware of the situation. (Wilson Dec. ¶ 7.) According to Wilson, Plaintiff told her that she did not know why her coworkers were trying to get her into trouble, nor did Plaintiff mention her race or age as motivating factors. (*Id.*) Wilson told Plaintiff that if the conduct continued, Defendant would be required to investigate the matter. (*Id.*)

During the week of February 7, 2000, Wilson spoke with Plaintiff again. Wilson avers that Plaintiff told her that when three of her coworkers gathered, they laughed and talked, and Plaintiff suspected they were talking about her even though she had not heard any of their comments. (Wilson Dec. ¶ 8.) Wilson later discovered that the three coworkers were Saita'a "Ta'a" Brooks, Tashania Spinks Smith, and Christina Lamb. Plaintiff also told Wilson that she thought one of the three coworkers was trying to sabotage her work because some of Plaintiff's paperwork was found in the breakroom where Plaintiff had not left it. (Pl.'s Dep. at 153; Wilson Dec. ¶ 8.) However, Plaintiff did not witness or know anyone who witnessed an employee leaving the paperwork in the breakroom. Wilson avers that she chose not to confront the three individuals based on her years of human resources experience and because Plaintiff had not suggested that she felt threatened or intimidated by the employees. (Wilson Dec. ¶ 8.)

Plaintiff also stated in her deposition that various acts of intimidation occurred which she did not report to anyone at Arrow. Plaintiff stated that on one occasion Brooks slammed a jackhammer into some skids behind Plaintiff, making a loud noise. (Pl.'s Dep. at 147.) Plaintiff avers that on another occasion Brooks threw a chair and a piece of corrugate in anger. (*Id.* at 27–28.) Plaintiff further stated that Smith did not put spores on the skids once when she was packing at Plaintiff's station, (*id.* at 154), and, on another occasion, Smith paged Plaintiff to go to a packing area and left the phone off the hook so that Plaintiff could not return the page, (*id.* at 165–66). Plaintiff stated that she thought her coworkers engaged in this behavior because Smith, Brooks, and Lamb wanted Smith to have the roving packer job instead of Plaintiff. (*Id.* at 148.)

On February 14, 2000, Plaintiff was at Lamb's work area and informed Brooks that Morgan had instructed Plaintiff to assist Lamb with her packing. (*Id.* at 18–20.) According to Plaintiff, Brooks rolled her eyes and continued to assist Lamb. (*Id.*) Plaintiff then went to Jones and reported that Brooks was out of her work area and would not allow her to assist Lamb. (*Id.*) Plaintiff returned to Brooks and asked her if she had a problem with her. (*Id.* at 23.) According to Plaintiff, Brooks yelled at her about whether Plaintiff should be roving or packing. (*Id.* at 24–25.) Jones and Morgan met with Brooks and Plaintiff. Plaintiff avers that when she arrived in Brooks' area, she stood beside Morgan on one side of the conveyor belt, while Brooks and Jones stood on the other side. (*Id.* at 29–30.)

Plaintiff and Defendant's version of what occurred during this meeting differs greatly. According to Plaintiff, Brooks told

Plaintiff to "let her halo shine" and lunged across the conveyor belt toward her. (Pl.'s Dep. at 34.) Plaintiff stated that the two supervisors physically restrained Brooks and told Plaintiff to leave the area.[3] (*Id.* at 35.) Plaintiff walked to another area of the plant where she learned her husband was there to visit her. George Laprise encouraged Plaintiff to discuss the incident with her supervisors so Plaintiff met with Morgan and Jones who told Plaintiff she was safe. (*Id.* at 47.) The incident was not reported to the police and no legal action was filed against Brooks.

The next day, Plaintiff met with Wilson to inform her of the February 14 incident. Plaintiff stated that Wilson was very receptive and appeared shocked when she heard Plaintiff's version of the incident. (Pl.'s Dep. at 53.) Wilson told Plaintiff that Defendant would investigate the matter and that Plaintiff should also talk to Mosby. (*Id.* at 54.) Mosby also met with Morgan and Jones to discuss the incident. Because Morgan and Jones had consistent accounts of the February 14 incident, Mosby avers that he determined neither Plaintiff nor Brooks was anymore responsible than the other for the argument. (Mosby Dec. ¶ 4, Wilson Dec. ¶ 9.)

Plaintiff further alleges that sometime between February 15 and 18 Brooks walked by her in a "haughty" manner with a supervisor "flanked on her arm." (Pl.'s Dep. at 58.) However, Plaintiff admitted that the supervisor had no supervisory authority over Brooks or Plaintiff. (Pl.'s Dep. at 240.) Plaintiff was upset by Brooks' manner so she paged Mosby. Plaintiff informed Mosby that she was scared as a result of her confrontation with Brooks on February 14, 2000. (Mosby Dec. ¶ 3.) Mosby asked Plaintiff if Brooks had threatened her since the February 14 incident, and Plaintiff stated that she had not. (Mosby Dec. ¶ 3.) Plaintiff stated that she feared Brooks because of the "look" Brooks had during the argument on February 14. (*Id.*) Mosby avers that Plaintiff informed him that she thought Brooks would have attacked her if Morgan and Jones had not been present, but Plaintiff did not tell him that Brooks had lunged toward her. (*Id.*) Plaintiff told Mosby that Brooks had not threatened or harassed her in any way since the February 14 incident. (*Id.*) Mosby then told Plaintiff that Arrow would not tolerate any threats or harassment in the workplace and that she should notify him of any future problems. (*Id.*) Plaintiff did not report any further problems to Defendant; however, Plaintiff stated in her deposition that employees intimidated her in numerous ways.

Plaintiff avers that Brooks, Smith, and Lamb gathered on four or five occasions and laughed while they were looking at Plaintiff. (Pl.'s Dep. at 70.) Plaintiff stated that Brooks said "hi, Sue" in a loud voice as she walked to and from break. (*Id.*) Plaintiff avers that on one occasion Brooks slammed her locker and on another occasion Smith stood in front of Plaintiff and impeded her from walking by Smith. (*Id.*) Plaintiff states that Lamb walked briskly toward Plaintiff and told her in front of Morgan that her numbers were wrong. (*Id.* at 78.) Also, Plaintiff's coworker, Linda Harrellson, stated in her deposition that she heard Brooks say she hated Plaintiff. (Harrellson's Dep. at 42–

---

**3.** Morgan and Jones specifically deny touching either Brooks or Plaintiff. Morgan and Jones deny that there were any threats or physical contact between Brooks and Plaintiff on February 14, 2000. (Wilson Dec. ¶ 9; Mosby Dec. ¶ 4.) According to Morgan and Jones, both Plaintiff and Brooks became agitated, yelled, and pointed fingers at the other. (*Id.*) Each supervisor stated that Plaintiff was slow in leaving the area after being told to do so and she continued arguing with Brooks. (*Id.*)

43.)[4] Plaintiff and a coworker stated that black employees were allowed to perform less work than white employees without reprimands. (Harrellson's Dep. at 78–80, 93–95; Pl.'s Dep. at 337–39.) According to Plaintiff, Mosby also spoke socially to black employees and bypassed white workers. (Harrellson's Dep. at 88–89.)

On February 19–22, Plaintiff called into work stating that she was sick. Plaintiff resigned employment with Defendant on February 23, 2000, because Plaintiff alleges Defendant "withdrew its support" and failed to discipline her coworker after the incident on February 14, 2000. (Pl.'s Dep. at 181, 196.) On February 23, 2000, Plaintiff called Wilson and told her that she was quitting. Wilson asked Plaintiff not to quit and informed Plaintiff that she had talked to Brooks and investigated the February 14 incident. (Wilson Dec. ¶¶ 11–12.) Wilson told Plaintiff that although Brooks and both supervisors denied that Brooks had lunged toward Plaintiff, that Wilson counseled Brooks against engaging in any type of threatening or harassing behavior. (*Id.*) Wilson also told Plaintiff that she informed Brooks that Arrow would not tolerate any threats or harassment in the workplace. (*Id.*) Wilson informed Plaintiff that Brooks had expressed regret about the situation and denied having any ill feelings toward Plaintiff. (Pl.'s Dep. at 181; Wilson Dec. ¶¶ 11–12.) Wilson then encouraged Plaintiff to reconsider her decision, telling her that Defendant would not tolerate threats in the workplace and that the situation would be monitored if she chose to continue her employment. (Wilson Dec. ¶¶ 11–12.) According to Wilson, Plaintiff did not tell her at any time that Brooks or any other employee had been threatening since February 14, 2000.

Furthermore, Plaintiff stated during her deposition that the sole reason she resigned was because she "felt unsafe" after the February 14, 2000, incident. (Pl.'s Dep. at 12.)

## II. SUMMARY JUDGMENT STANDARD

A motion for summary judgment will be granted only if it is established through pleadings, affidavits, depositions, and other discovery documents that there exists no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Where the evidence before the court could lead a reasonable juror to find for the nonmovant, a genuine issue of material fact exists and summary judgment is improper. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). The district court must evaluate the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences from the facts in that party's favor. *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962). The burden is on the moving party to establish that no material factual issues exist. *See* Fed.R.Civ.P. 56(c); *Pulliam Inv. Co. v. Cameo Properties*, 810 F.2d 1282, 1286 (4th Cir.1987). While the court "must take special care when considering a motion for summary judgment in a discrimination case because motive is often the critical issue, summary judgment disposition remains appropriate if the plaintiff cannot prevail as a matter of law." *Evans v. Technologies Applications & Serv. Co.*, 80 F.3d 954, 958–59 (4th Cir.

---

4. Linda Harrellson's Deposition is attached to plaintiff's brief in opposition to Defendant's Motion for Summary Judgment.

1996) (citing *Ballinger v. North Carolina Agric. Extension Serv.*, 815 F.2d 1001, 1005 (4th Cir.), *cert. denied*, 484 U.S. 897, 108 S.Ct. 232, 98 L.Ed.2d 191 (1987)).

## III. DISCUSSION

 Defendant has moved, pursuant to Federal Rule of Civil Procedure 56, for summary judgment as a matter of law on the Title VII and ADEA claims asserted by Plaintiff. Title VII of the Civil Rights Act of 1964, as amended, creates a federal cause of action for various types of employment discrimination.[5] The ADEA prohibits discrimination in employment on the basis of age.[6] To succeed on a claim under Title VII or the ADEA, a plaintiff must prove discriminatory intent of the defendant. *See Moore v. City of Charlotte*, 754 F.2d 1100, 1105 (4th Cir.1985). A plaintiff may prove discriminatory intent by way of direct evidence or through circumstantial evidence. *Id.; see also Rankin v. Greater Media, Inc.*, 28 F.Supp.2d 331, 336 (D.Md. 1997) (discussing the methods of proving discriminatory intent of the defendant in both Title VII and ADEA cases). Direct proof of discriminatory intent may be shown through direct evidence by introducing statements of the defendant. *See Moore*, 754 F.2d at 1105 (citing *United States Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 714 n. 3, 103 S.Ct. 1478, 1481 n. 3, 75 L.Ed.2d 403 (1983)). In the present case, Plaintiff has presented no direct evidence of discrimination based on Plaintiff's race or age.[7] This lack of direct proof is, however, not fatal to a claimant's case under Title VII or the ADEA.

In *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), the Supreme Court crafted a burden-shifting analysis and a framework for the proper presentation of proof in a Title VII case alleging racial discrimination. This burden-shifting framework also applies in ADEA cases. *See Burns v. AAF–McQuay, Inc.*, 96 F.3d 728, 731 (4th Cir. 1996) (citing *Tuck v. Henkel Corp.*, 973 F.2d 371, 374–75 (4th Cir.1992)). The burden-shifting analysis has been refined as follows:

> First, the plaintiff has the burden of proving by the preponderance of the evidence a prima facie case of discrimination. Second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the employee's rejection. Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by the preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.

---

5. Title VII of the Civil Rights Act of 1964 makes it "an unlawful employment practice for an employer . . . to discharge any individual . . . with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1).

6. The ADEA states, "It shall be unlawful for an employer . . . to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1).

7. Although Plaintiff's complaint alleges race and age related comments, Plaintiff denied in her deposition that such comments were made and admitted the complaint was in error. (Pl.'s Dep. at 194–95.) In the deposition, Defendant's counsel asked, "So nobody—no coworker or supervisor made any unwelcome comment regarding your race or age. Is that correct?" *Id.* Plaintiff responded, "That is correct." *Id.*

*Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 252–53, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981) (internal citations omitted). Plaintiff retains the ultimate burden of proving that the challenged action was the result of intentional discrimination based on an impermissible motive. *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 534, 113 S.Ct. 2742, 2761, 125 L.Ed.2d 407 (1993) (citing *Burdine,* 450 U.S. at 256, 101 S.Ct. at 1094–95, 101 S.Ct. 1089).

■ The burden of establishing a prima facie case of racial or age discrimination is not onerous. The plaintiff must prove by a preponderance of the evidence that (1) she is a member of a protected group; (2) she was discharged or subjected to an adverse employment action; (3) she was qualified for her position; and (4) she was replaced by someone outside her protected class.[8] *See Rankin,* 28 F.Supp.2d at 336; *see also McDonnell,* 411 U.S. at 802, 93 S.Ct. at 1824.

■ The employment discrimination laws require as an absolute precondition to suit that some adverse employment action have occurred. *See Bristow v. Daily Press, Inc.,* 770 F.2d 1251, 1255 (4th Cir. 1985). Plaintiff has failed to present sufficient evidence on which a jury could find that she was discharged or subjected to adverse employment action. Plaintiff first

points to Defendant's withdrawal of support and failure to address her concerns about workplace violence by a coworker as evidence that she was treated less favorably than black coworkers and thus subjected to adverse employment action because of her race. (Pl.'s Resp. Opp'n Def.'s Mot. Summ. J. at 3.) In support of her ADEA claim, Plaintiff alleges that all of the parties receiving preferential treatment were under the age of 40 and thus younger than Plaintiff. (*Id.* at 7.) In support of her constructive discharge claim, Plaintiff alleges that she was forced to resign after conditions in the workplace became intolerable. (*Id.* at 5, Pl.'s Dep. at 57–60.) Each of these claims will be considered in turn.[9]

1. *Management's Withdrawal of Support as an Adverse Employment Action*

■ In determining what constitutes an "adverse employment action," the Fourth Circuit has consistently focused on "whether there has been discrimination in what could be characterized as ultimate employment decisions such as hiring, granting leave, discharging, promoting, and compensating." *Page v. Bolger,* 645 F.2d 227, 233 (4th Cir.1981). While this list of ultimate employment decisions is not exclusive, Title VII does not reach "in-

---

**8.** The worker who replaces an ADEA plaintiff apparently does not need to be outside the protected class (i.e., someone under 40), provided that the replacement is younger than the plaintiff. The Supreme Court has stated, "The fact that one person in the protected class has lost out to another person in the protected class is thus irrelevant, so long as he has lost out because of his age." *O'Connor v. Consolidated Coin Caterers Corp.,* 517 U.S. 308, 312, 116 S.Ct. 1307, 1310, 134 L.Ed.2d 433 (1996).

**9.** In addition to her Title VII, ADEA, and constructive discharge claims, Plaintiff's complaint also states that she was "subjected to an [sic] hostile work environment due to the comments of her coworkers and supervisors regarding her race and age." (Compl.¶ 21.) However, when Plaintiff was asked about this portion of the complaint during her deposition, Plaintiff stated, "I never said that. I never said that." (Pl.'s Dep. at 194.) Plaintiff then stated that no coworker or supervisor made any unwelcome comment regarding her race or age. (*Id.*) Therefore, Plaintiff has failed to present any evidence to support her hostile work environment claim.

terlocutory or mediate decisions having no immediate effect upon employment conditions." *Id.*

Recently, the Fourth Circuit revisited the issue of what is actionable under Title VII. In *Boone v. Goldin,* 178 F.3d 253 (4th Cir.1999), the court recognized that Title VII liability can arise from a "tangible employment action," which the court defined to include not only "hiring, firing, failing to promote, . . . [and a] significant change in benefits," but also "reassignment with significantly different responsibilities." *Boone,* 178 F.3d at 256 (citing *Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 761, 118 S.Ct. 2257, 2268, 141 L.Ed.2d 633 (1998)). In *Boone,* the plaintiff alleged that she was reassigned for discriminatory reasons. The court found that the plaintiff's reassignment was not actionable because it was not an adverse employment action; however, the court reasoned that reassignment could be an adverse employment action if it had a "significant detrimental effect" on the plaintiff. *Id.* at 255–56, 178 F.3d 253.

■ Viewing the facts in the light most favorable to the nonmoving party, Plaintiff cannot establish that Defendant ever subjected her to any adverse employment action because of her race or age. First, Plaintiff alleges that she was treated less favorably than black coworkers who were under age 40 and that she was "denied support from management" because Arrow failed to address her concerns about workplace violence by her coworker, Brooks (who is black [10] and under the age of 40). (Pl.'s Resp. Opp'n Def.'s Mot. Summ. J. at 3, 7; Compl. ¶ 21.) Plaintiff cannot rely merely on her subjective belief that her

employer wrongfully failed to discipline a coworker as evidence of an adverse employment action directed toward Plaintiff. Furthermore, Plaintiff admits that neither she nor Brooks were formally disciplined as a result of the February 14 incident. (Pl.'s Dep. at 166.) Thus, Plaintiff cannot claim that Defendant treated her differently than Brooks with regard to the February 14 incident.

In addition, Plaintiff has failed to present evidence that Defendant discriminated against her in an ultimate employment decision, such as the denial of a job, promotion, or pay raise. Instead, Plaintiff admits that "she received raises and positive comments from human resources." (Pl.'s Resp. Opp'n Def.'s Mot. Summ. J. at 3.) Plaintiff also applied for only one posted position as a packer, and she was awarded that job. (Wilson Dec. ¶ 6.) While Plaintiff alleges that her supervisors made her perform a stationary packing job on several occasions when she would have preferred to rove, there was no "significant detrimental effect" on Plaintiff because Defendant provides packers and roving packers with exactly the same rate of pay and benefits. (Pl.'s Dep. at 117–18.) Furthermore, Plaintiff's reassignment as a stationary packer instead of a roving packer does not constitute a "reassignment with significantly different responsibilities" because the responsibilities of the two are very similar.

■ Finally, Plaintiff alleges that some black employees were treated more favorably than Plaintiff. Plaintiff asserts that Thompson, Brooks, and Spinks were allowed to perform less work than white employees without reprimand. (Pl.'s Dep.

---

**10.** Plaintiff and Defendant each state that Brooks is a different race. Defendant identifies Brooks as an Asian–American female. (Def.'s Brief Supp. Mot. Summ. J. at 5.) Plaintiff identifies Brooks as a black female. (Pl.'s

Resp. Opp'n Def.'s Mot. Summ. J. at 2.) Because the court must draw all inferences in the light most favorable to Plaintiff, the court will treat Brooks as a black female.

at 337–39.) Plaintiff also alleges that a supervisor, Mosby, showed preferential treatment to black employees by speaking socially to them and bypassing white workers. (Harrellson's Dep. at 88–89.) However, despite Plaintiff's contention that Mosby showed preferential treatment to black employees, Plaintiff stated in her deposition that she and Mosby had "a very good ... working relationship." (Pl.'s Dep. at 56.) Thus, none of Plaintiff's allegations can be characterized as discrimination that could be considered "ultimate employment decisions" involving denial of a job, promotion, or pay raise. Furthermore, Plaintiff has offered no case law to support her contention that allowing some workers to perform less work or speaking socially to black workers and bypassing white workers rises to the level of an "adverse employment action" that is necessary to support a claim under Title VII or the ADEA. Rather, to the contrary, the courts have stated that Title VII is not intended to remedy "trivial discomforts endemic to employment." *Boone*, 178 F.3d at 256. Therefore, Plaintiff has failed to present sufficient evidence on which a jury could find that Defendant discriminated against Plaintiff by "withdrawal of support" or in any ultimate employment decision.

### 2. *Constructive Discharge*

Plaintiff further alleges that she suffered adverse employment action because she was constructively discharged as a result of her race and/or age. "A constructive discharge occurs when an employer deliberately makes an employee's working conditions intolerable and thereby forces [her] to quit [her] job." *Bristow v. Daily Press, Inc.*, 770 F.2d 1251, 1255 (4th Cir.1985) (citations and internal quotations omitted). The Fourth Circuit has also stressed that

[t]he doctrine of constructive discharge protects an employee from a calculated effort to pressure him into resignation though the imposition of unreasonably harsh conditions, in excess of those faced by his coworkers. The employee is not, however, guaranteed a working environment free of stress. Dissatisfaction with work assignments, a feeling of being unfairly criticized, or difficult or unpleasant working conditions are not so intolerable as to compel a reasonable person to resign.

*Carter v. Ball*, 33 F.3d 450, 459 (4th Cir. 1994) (citations and internal quotations omitted). Thus, a "plaintiff alleging constructive discharge must ... prove two elements: deliberateness of the employer's action, and intolerability of the working conditions." *Bristow*, 770 F.2d at 1255. Each of these two elements will be considered in turn.

First, Plaintiff must show that her managers were acting deliberately. "Deliberateness exists only if the actions complained of were intended by the employer as an effort to force the employee to quit." *Id.* (internal quotations omitted); *see also Carter*, 33 F.3d at 459 (stating that "[d]eliberateness can be proven by actual or circumstantial evidence, including evidence of actions that single out a plaintiff for differential treatment"). Furthermore, plaintiff may show that an employer acted deliberately or with intent through demonstrating the employer's "failure to act in the face of known intolerable conditions." *Bristow*, 770 F.2d at 1255; *Martin v. Cavalier Hotel Corp.*, 48 F.3d 1343, 1354 (4th Cir.1995). In this regard, the court may consider "whether the employee attempted to air her grievances with supervisors or other management prior to resigning" and "whether the employee has given the employer a chance to take corrective action before she resigns." *Ran-*

*kin,* 28 F.Supp.2d at 341. Furthermore, other circuits have held that an employee who quits without giving her employer a reasonable chance to work out a problem is not constructively discharged. *See West v. Marion Merrell Dow, Inc.,* 54 F.3d 493, 498 (8th Cir.1995); *Garner v. Wal–Mart Stores, Inc.,* 807 F.2d 1536 (11th Cir.1987) (stating that plaintiff "did not give Wal–Mart a chance" to give her relief).

 Plaintiff first alleges that Defendant's deliberateness was demonstrated through Defendant's failure to act to discipline Brooks. (Pl.'s Resp. Opp'n Def.'s Mot. Summ. J. at 5.) Plaintiff specifically alleges that Defendant knew of Plaintiff's fear for her safety after the "near assault by her coworker" and the "lack of action taken by her supervisor, Daryl Mosby, effectively supported the conduct of the aggressors." *(Id.)* Contrary to Plaintiff's allegations, the evidence shows that Defendant investigated the February 14 incident immediately after it occurred. After discussing the incident with Morgan and Jones, Mosby determined that both Plaintiff and Brooks were at fault. Despite Morgan and Jones' reports that there were no threats, physical contact, or threat of physical contact, Mosby still instructed both supervisors to continue to monitor the situation. (Def.'s Mot. Summ. J., Mosby Dec. ¶ 4.) In addition, although Brooks denied lunging toward Plaintiff, Defendant counseled Brooks against engaging in any threatening behavior in the future. Even taking Plaintiff's statement that Brooks lunged at her as true, Plaintiff did not report any further problems with Brooks or any other coworkers after the February 14 incident. Finally, Brooks expressed regret to Wilson about the incident and denied having any ill feelings toward Plaintiff. Wilson and Mosby each assured Plaintiff that Defendant would monitor the situation and that Defendant would not

tolerate threats or harassment. Thus, Defendant had no reason to believe that Brooks posed a threat to Plaintiff's physical safety. Furthermore, even though Plaintiff stated that on one occasion Brooks walked by her "flanked by a supervisor" causing Plaintiff to feel that "nothing had been done as far as [Brooks] being written up," (Pl.'s Dep. at 58), the "law does not allow an employee's subjective perceptions of what she thinks her employer is doing or might do govern a claim of constructive discharge." *Raley v. Board of St. Mary's County Comm'rs,* 752 F.Supp. 1272, 1279 (D.Md.1990) (citing *Bristow,* 770 F.2d at 1254–55).

Defendant also demonstrated a strong interest in retaining Plaintiff which runs contrary to Plaintiff's contention that Defendant deliberately forced Plaintiff to quit. When Plaintiff called Wilson on February 21 or 22 and again on February 23, 2000, Wilson encouraged Plaintiff to continue her employment with Defendant and informed her that Defendant would closely monitor the situation if Plaintiff chose to stay. Wilson also told Plaintiff that Defendant considered her a good employee. However, Plaintiff refused to stay despite the fact that only nine days had passed since the February 14 incident. (Wilson Dec. ¶ 10, Pl.'s Dep., Ex. 8.) Plaintiff then voluntarily terminated her employment without giving Defendant a reasonable opportunity to address any further concerns. Plaintiff also never informed anyone in management that she felt as though she was under any discriminatorily motivated duress by her employer. Therefore, even viewing the facts in the light most favorable to Plaintiff, Plaintiff has failed to demonstrate deliberateness.

 Moreover, even if Plaintiff could show some deliberate effort, Plaintiff has failed to establish the second element of constructive discharge, that is, that her

working conditions were intolerable. Intolerability of working conditions is assessed by the objective standard of whether a reasonable person in the employee's position would have felt compelled to resign. *See Bristow,* 770 F.2d at 1255. An employee may not be unreasonably sensitive to her working environment; thus, the law does not allow an employee's subjective perceptions to govern a claim of constructive discharge. *See id.* Finally, while an employee is "protected from a calculated effort to pressure him into resignation," an employee "is not guaranteed a working environment free of stress." *Id.*

■ Even viewing the evidence in the light most favorable to the nonmoving party, Plaintiff has presented no evidence to establish that her working conditions were so intolerable that a reasonable person would have felt compelled to resign. Instead, Plaintiff relies on conclusory allegations simply stating, "Plaintiff testified that she enjoyed the work itself, even with its normal challenges and disappointments;" however, "after the near assault and the decision to retain the assailant's services, conditions in the workplace became intolerable." (Pl.'s Resp. Opp'n Def.'s Mot. Summ. J. at 5.) Upon the court's exhaustive review of the deposition testimony, it appears Plaintiff also alleges that her coworkers engaged in acts of sabotage and intimidation. Plaintiff's allegations of sabotage and intimidation constitute nothing more than typical workplace conflicts. *See Rankin,* 28 F.Supp.2d at 342 (holding that mild reprimands and performance evaluations about which the employer and employee disagree are typical interoffice disputes); *see also Munday v. Waste Management of North America, Inc.,* 126 F.3d 239, 244 (4th Cir.1997) (holding that a plaintiff who never received a reprimand or unsatisfactory evaluation but was ignored by her coworkers and by the

top supervisor had failed to demonstrate constructive discharge).

According to Plaintiff, she resigned from her job at Arrow solely because she felt unsafe after the February 14 incident. Although Defendant alleges there was never any physical contact or even threats of physical contact between Plaintiff and Brooks, the court must view the facts in the light most favorable to Plaintiff. Even taking the fact that Brooks lunged at Plaintiff as true, there is little to suggest that Plaintiff's working conditions would have been objectively intolerable based on this isolated incident with Brooks. While a "credible death threat that signals grave danger to the plaintiff's bodily integrity ... can constitute grounds for finding constructive discharge," no such threat was made here. *See Tutman v. WBBM–TV,* 209 F.3d 1044, 1050 (7th Cir.2000). Defendant made every attempt to remedy the situation and protect Plaintiff. Defendant promptly evaluated the situation, and even though Brooks denied lunging at Plaintiff, Defendant told Brooks that Defendant would not tolerate such behavior. Plaintiff has failed to present evidence that her working conditions were so intolerable that a reasonable person would have felt forced to resign.

■ Plaintiff has failed to establish that the dispute with Brooks was related in any way to her race or age. Instead, Plaintiff stated that she believed Brooks was upset because she wanted Smith to have Plaintiff's roving packer job. (Pl.'s Dep. at 148.) Because Plaintiff was not constructively discharged but voluntarily resigned, no adverse employment action has occurred.

Plaintiff has not met her burden under the *McDonnell Douglas* framework in that she has failed to establish a prima facie case of discrimination. The evidence is

such that a reasonable fact finder could not return a verdict for Plaintiff.

## IV. CONCLUSION

For the reasons discussed herein, Defendant's Motion for Summary Judgment will be granted on Plaintiff's claim under Title VII and the ADEA.

A judgment in accordance with this memorandum opinion shall be filed contemporaneously herewith.

### *JUDGMENT*

For the reasons set forth in the memorandum opinion entered contemporaneously herewith,

IT IS ORDERED that Defendant Arrow International, Inc.'s Motion for Summary Judgment [10] is granted.